**LOUISVILLE JOINT STOCK LAND BANK**
**v. RADFORD. ***

No. 6959.

Circuit Court of Appeals, Sixth Circuit.

Feb. 11, 1935.

*Writ of certiorari granted 55 S. Ct. 547, 79 L. Ed. ⸺

J. E. Tarrant and William Marshall Bullitt, both of Louisville, Ky. (J. E. Tarrant, of Louisville, Ky., on the brief), for appellant.

E. A. Krauthoff, of Chicago, Ill., Harry H. Peterson, of St. Paul, Minn., and William Lemke, of Washington, D. C. (P. O. Sathre, of Bismarck, N. D., David A. Sachs, Jr., of Louisville, Ky., and Frank Rives, of Hopkinsville, Ky., on the brief), for appellee.

Robert H. Winn, of Mount Sterling, Ky., amicus curiæ.

Before MOORMAN, HICKS, and SIMONS, Circuit Judges.

SIMONS, Circuit Judge.

This appeal, seasonably allowed by us and by the District Court, raises questions in respect to the constitutionality of section 75 of the Bankruptcy Act, as amended by the Frazier-Lemke Act of June 28, 1934 (adding subsection (s), 11 USCA § 203). The facts are not in dispute, and are sufficiently found in the opinion of the District Judge. In re Radford, 8 F. Supp. 489.

The bankrupt is a farmer. In 1922 he borrowed $8,000 and in 1924 an additional $1,000 from the appellant bank, giving as security mortgages on his 170-acre farm in Christian county, Ky., the mortgages containing covenants to pay taxes and to keep the buildings insured. Upon default in the payment of principal, interest, and taxes, and through allowance of insurance to lapse, the bank, pursuant to the terms of the mortgages, declared the entire indebtedness thereon due and payable, and on June 5, 1933, filed a foreclosure suit in the circuit court of Christian county. Later the bank moved for the appointment of a receiver, but, upon being informed by the conciliation commissioner of the county that Radford desired to avail himself of the benefits of section 75 of the Bankruptcy Act (11 USCA § 203), providing for agricultural compositions and extensions, the court declined to appoint the receiver, and stayed the foreclosure suit. On February 26, 1934, Radford filed in the United States District Court his petition and schedule under section 75. On June 30, 1934, the Christian county circuit court entered judgment for the bank for the full amount of Radford's indebtedness, sustained the mortgages as a first lien upon his farm, and ordered the property sold by the master commissioner. Before the sale could be had, Radford, on August 6, 1934, filed in the District Court an amended petition under the Frazier-Lemke Act, asking to be adjudged a bankrupt; that proceedings against him be stayed for a period of five years; that he be allowed to retain possession of the property during that period; and that he be given an option to purchase the mortgaged property at its appraised value at its termination. The bank intervened and answered, alleging section 75 as amended to be unconstitutional, asking dismissal of the bankruptcy proceedings, and that it be allowed to pursue its remedies in accordance with the judgment of the circuit court. Rad-

ford admitted the allegations of fact in the answer, and the case was submitted upon the pleadings. The court held section 75 and the Frazier-Lemke Amendment constitutional, adjudged Radford a bankrupt, and referred the cause to the referee for further proceedings.

Radford then petitioned to have his property appraised, his exemptions set aside, and that he be allowed to retain possession of the property and pay for it under the terms of subsection (s) of section 75 of the Bankruptcy Act (11 USCA § 203 (s). The referee appointed appraisers, who appraised all of Radford's property, and fixed the fair and reasonable value of the mortgaged property at $4,445. The bank in open court offered to pay $9,205.09 in cash for the mortgaged property, but the referee refused to consider the offer, approved the report of the appraisers, fixed the fair and reasonable value at $4,445, and ordered that possession thereof should remain in Radford, subject to a general lien in the trustee as security for the payment of the value of the property. Radford thereupon requested the trustee to sell him the mortgaged property under the terms and conditions of paragraph (3) of subsection (s) of section 75 of the act, 11 USCA § 203 (s) (3). The bank refused consent, and filed its written objections thereto. Radford then petitioned the court to stay all proceedings against him for five years, and to allow him to retain possession upon a reasonable annual rental to be fixed by the court. The petition was granted, proceedings were stayed, the bank enjoined from enforcing its mortgage lien for five years, and Radford allowed to retain possession on payment of $325 on May 1, 1935, as rental for the first year, with rental for subsequent years to be fixed by the court. Upon a petition to the District Court for review, the referee's orders were sustained, and the bank took its appeal.

Section 75 of the Bankruptcy Act, as originally enacted, was part of the Act of March 3, 1933, entitled "Provisions for the Relief of Debtors." It provided that any farmer claiming to be insolvent or unable to meet his debts might file a petition for composition or an extension. This automatically gave the bankruptcy court the same power and jurisdiction over the farmer and his property as if a voluntary petition for adjudication had been filed, and a decree of adjudication entered. Thereupon all proceedings against the farmer and his farm property, including his home and household effects, were stayed, except for the collection of taxes. The proposed composition or extension could be confirmed by the court only upon written acceptance by a majority of creditors in number and amount, but such composition or extension might not reduce the amount of or impair the lien of a secured creditor, but affect only the time and method of its liquidation.

The Frazier-Lemke Act of June 28, 1934, is an amendment to section 75 of the Act of March 3, 1933. Its text is fully set forth in the opinion of the District Judge, and it is therefore not necessary to burden this opinion with it. It is sufficient for our purpose to say that it provides that a farmer failing to obtain the necessary consent to the terms of a composition or extension may by amended petition ask to be adjudged a bankrupt and secure the appointment of appraisers, who shall appraise all of his property at its then fair and reasonable value, not necessarily its market value, and, after such appraisal, and after his exemptions under the state law have been set aside to him, then upon an agreement with the lienholders the trustee in bankruptcy must sell back to him all or any part of his property upon the terms specified in the act, but that, if any secured creditor refuses to consent to such sale, the court shall stay all proceedings for a period of five years, during which time the farmer may retain possession of all or any part of his property, provided he pays a reasonable annual rental therefor. At any time within five years the farmer may obtain full possession and title to his property by paying into court either its original appraised value, or, in the case of mortgaged real estate, a reappraised price at the option of the lienholder, and may apply for his discharge in bankruptcy. The provisions of the act apply, however, only to debts existing on June 28, 1934.

The legislation in respect to its validity under the Federal Constitution is attacked on two main grounds. It is asserted (1) that section 75 as amended is not a law on the subject of bankruptcies and does not deal with any subject over which power is delegated to Congress, and so is in contravention of the Tenth Amendment to the Constitution of the United States; and (2) that it deprives creditors of their property without due process of law, and is therefore in contravention of the Fifth Amendment to the Constitution.

The power to legislate with respect to bankruptcies is conferred upon the Congress

by the fourth clause of section 8 of article 1 of the Constitution, whereby there is vested in it the power "* * * to establish * * * uniform laws on the subject of bankruptcies throughout the United States." This power is conferred by express grant, and is, so far as the granting clause is concerned, without qualification or limitation. "The power of Congress to establish uniform laws on the subject of bankruptcies throughout the United States is unrestricted and paramount." International Shoe Co. v. Pinkus, 278 U. S. 261, 265, 49 S. Ct. 108, 110, 73 L. Ed. 318.

On the first ground it is said that a law is not one on the subject of bankruptcies which does not provide for the speedy distribution of an insolvent debtor's assets among his creditors. The contention is that the attacked legislation fails to meet this test in providing that the debtor may at his option retain his property, that his debts may be reduced to the fair and reasonable value of his property, not necessarily the market value, and that he shall have a five-year moratorium on the payment of this reduced amount.

Whatever may have been the primary purpose of bankruptcy laws, their historical development and the concept of an earlier day, illustrated by the provisions of English bankruptcy statutes and colonial insolvency laws, it is now established that the subject of bankruptcies includes, not only the ratable distribution of the debtor's property, but the discharge of the bankrupt from his obligations. No commentary upon the connotation of the constitutional phrase has been so often quoted as that of Mr. Justice Catron in the case of Matter of Klein, reported in the note to Nelson v. Carland, 1 How. 265, 277, 11 L. Ed. 126: "I hold, it extends to all cases where the law causes to be distributed, the property of the debtor among his creditors: this is its least limit. Its greatest, is a discharge of the debtor from his contracts. And all intermediate legislation, affecting substance and form, but tending to further the great end of the subject—distribution and discharge—are in the competency and discretion of Congress.

"With the policy of a law, letting in all classes, others as well as traders; and permitting the bankrupt to come in voluntarily, and be discharged without the consent of his creditors, the courts have no concern; it belongs to the lawmakers."

To this comment the Supreme Court gave approval in Hanover National Bank v. Moyses, 186 U. S. 181, at page 186, 22 S. Ct. 857, 46 L. Ed. 1113.[1] Whether the limits drawn by Mr. Justice Catron mark the ultimate of the modern concept of bankruptcy it is not necessary to decide, for they are sufficient for present purposes. It has been said that distribution of property is the principal object to be attained, and that the discharge of the debtor is merely incidental, U. S. v. Fox, 95 U. S. 670, 24 L. Ed. 538. This but illustrates the historical development of bankruptcy legislation. Judge Taft, speaking for this court in Leidigh Carriage Co. v. Stengel, 95 F. 637, 647, enumerates the purposes of bankruptcy acts in the order of their chronological development rather than in the order of their present importance when he declares that the third purpose of a Bankruptcy Act is "to relieve debtors from the burden of debts which, through business misfortunes and otherwise they have incurred, and which they are unable to pay."

One of the tests applied to state insolvency laws to determine whether they invade the field conveyed to and occupied by the Congress is to ascertain whether they contain provisions for the discharge of the insolvent debtor from all or part of his debts. If they do, the statute is one of bankruptcy. Pobreslo v. Joseph M. Boyd Co., 287 U. S. 518, 53 S. Ct. 262, 77 L. Ed. 469; Johnson v. Star, 287 U. S. 527, 53 S. Ct. 265, 77 L. Ed. 473; International Shoe Co. v. Pinkus, supra. While this may not be the sole test, it is undoubtedly an important one. See "What is a Bankruptcy Act," by Prof. Max Radin, vol. 20, American Bar Association Journal, 792.

It is an undoubtedly desirable concomitant of bankruptcy legislation that distribution of the debtor's assets be made as speedily as is consistent with the attainment of the principal objectives of such laws, but that prompt distribution is a necessary prerequisite to the exercise of the granted power we doubt, and no cited case so holds. Observations on the manifest purpose of specific statutes are not to be interpreted as limitations upon a constitutional power, nor is its exercise to be based upon a standard so elastic as to shift with varying judgments based upon differences of time and circumstance. Even so it is doubtful whether the courts will oppose their judgment as to what constitutes speedy distribution to that of the

---

[1] See vol. 21, American Bar Ass'n Journal, 49, 50.

Congress, except as the legislative standard may be so grossly arbitrary and unreasonable as to offend against the due process clause of the Fifth Amendment, to be hereinafter discussed.

 The challenged statute provides for ratable distribution of the bankrupt's assets among his creditors. It provides for his discharge. That it also in response to a manifest public purpose opens the door of opportunity to his ultimate rehabilitation is not of itself destructive of the character of the legislation as within the constitutional grant of power. The limitation of its assailed provisions to a single class does not invalidate it if the classification be reasonable, for the uniformity required by the Constitution is geographical and not personal. Hanover National Bank v. Moyses, supra.

Compositions have generally been regarded as in some respects outside of bankruptcy proceedings, but nevertheless as reasonably auxiliary thereto. Provisions in bankruptcy statutes for compositions have never been held to invalidate them, though the creditor by reason thereof receives but his pro rata share of the fair value of the bankrupt's assets, while the debtor retains possession and title to his property. Of course, with respect to consenting creditors, it is a matter of agreement, In re Lane (D. C.) 125 F. 772, 773; Cumberland Glass Mfg. Co. v. DeWitt, 237 U. S. 447, 452, 35 S. Ct. 636, 59 L. Ed. 1042, yet it is coercion as to nonassenting creditors, however, it may be rationalized by considering creditors as a class with the will of the majority enforced upon the minority. Nor has the provision in bankruptcy acts permitting trustees to sell mortgaged property free and clear of lien been considered destructive of their validity as acts upon the subject of bankruptcy. "To transfer the lien from the property to the proceeds of its sale is the exercise of a lesser power [than sale]; and legislation conferring it is obviously constitutional." Van Huffel v. Harkelrode, 284 U. S. 225, 228, 52 S. Ct. 115, 116, 76 L. Ed. 256, 78 A. L. R. 453.

 It must be remembered that constitutional power is not necessarily confined within those limits within which the Congress has hitherto seen fit to exercise it. The novelty of a provision is no demonstration of its invalidity. The grant to Congress of the power to establish bankruptcy laws involves the power to impair the obligation of contracts—this the States are by the Fourteenth Amendment forbidden to do.

Hanover National Bank v. Moyses, supra. No case has been cited which limits this power to contracts which are unsecured, and none has been found. On the contrary, it has frequently been held that private contracts may not impose a restriction upon the exercise of a constitutional power, Louisville & Nashville R. Co. v. Mottley, 219 U. S. 467, 485, 31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671; Monongahela Bridge Co. v. U. S., 216 U. S. 177, 193, 30 S. Ct. 356, 54 L. Ed. 435; Addyston Pipe & Steel Co. v. U. S., 175 U. S. 211, 229, 20 S. Ct. 96, 44 L. Ed. 136, and preferences valid under state law have been destroyed by the exercise of federal power under the bankruptcy clause. The subject of bankruptcies comprehends every phase of the relations between an insolvent or nonpaying or fraudulent debtor and his creditors, extending to his or their relief. In re Reiman, 20 Fed. Cas. 496, No. 11,673 (D. C. N. Y.), affirmed Fed. Cas. No. 11,675 (C. C. N. Y.).

 We come then to the contention that the assailed statute offends against the due process clause of the Fifth Amendment. Conceding that the due process clause limits the power or the manner of its exercise under the bankruptcy clause, it nevertheless does not vitiate it. The Constitution is not self-destructive—"the powers which it confers on the one hand it does not immediately take away on the other." Billings v. U. S., 232 U. S. 261, 282, 34 S. Ct. 421, 424, 58 L. Ed. 596; McCray v. U. S., 195 U. S. 27, 24 S. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561. Perhaps all that is or can be said from the point of view of the appellant is expressed in Hanover National Bank v. Moyses, supra: "Congress may prescribe any regulations concerning discharge in bankruptcy that are not so grossly unreasonable as to be incompatible with fundamental law," and this is the test that we apply to the contentions upon which the validity of the statute is attacked.

 While the Congress does not by reason of a national emergency draw unto itself under the bankruptcy clause powers not previously possessed, since "emergency does not create power," yet the existence of an emergency is not to be ignored when validity is to be determined by the reasonableness of the extent to which, and the means by which, constitutional power is exercised, assuming limitations upon such power exerted by the due process clause. That the assailed legislation was conceived in emergency and ad-

dressed to the legitimate end of relieving widespread national distress is implicit in the provisions limiting the operation of paragraph 7 of section 75 (s) of the act, 11 US CA § 203 (s) (7), to debts existing June 28, 1934, providing that it shall expire in 1938, and by the declaration of policy in substantially contemporaneous amendments to the Bankruptcy Act. That the Frazier-Lemke Act does not itself contain an express declaration of a policy based upon the existence of an emergency is unimportant. A declaration by the Legislature as to the existence of an emergency, while entitled to great weight, is not conclusive. Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 65 L. Ed. 865, 16 A. L. R. 165. It must follow that the absence of such formal declaration, if the purpose and policy of the act be otherwise disclosed, is equally inconclusive, and the courts are not required to close their eyes to that which everybody knows exists.

In considering whether the regulations concerning discharge are so grossly unreasonable as to be incompatible with fundamental law, we apply, therefore, a criterion which itself is not one of unyielding rigidity or narrow conception. "There has been a growing appreciation," said the Supreme Court in Home Building & Loan Ass'n v. Blaisdell, 290 U. S. 398, 442, 54 S. Ct. 231, 241, 78 L. Ed. 413, 88 A. L. R. 1481, "of public needs and of the necessity of finding ground for a rational compromise between individual rights and public welfare." As a leading text-writer has put it: "The concept of the balance of convenience between private rights and public welfare runs throughout the entire scope of due process." Mott, Due Process of Law (1926), 597.[2] It follows, if these observations are sound, that the exercise of constitutional power in the public interest is not to be limited by considerations of form rather than of substance, and that the fair intent of the constitutional limitation in the Fifth Amendment no more precludes the Congress from meeting the public need because of a pressing public disaster than does that in the Fourteenth Amendment constrain the states in similar situations so long as the relief afforded has reasonable relation to the legitimate end to which the legislation is directed. W. B. Worthen Co. v. Thomas, 292 U. S. 426, 433, 54 S. Ct. 816, 78 L. Ed. 1344, 93 A. L. R. 173. The public welfare sought to be conserved by the assailed legislation not only transcends the interest of the class to be affected, but is rooted in the traditional policy of the United States to prevent the development of a great class of dependent tenant farmers comparable to the peasantry of European states. This policy was early reflected in the disposition of the public domain, the homestead laws, and the limitations written into the railroad land grants restricting sales in quantity and price and to actual settlers. Oregon & California R. Co. v. U. S., 238 U. S. 393, 35 S. Ct. 908, 59 L. Ed. 1360. This is not to say that substantial private rights must yield to public policy in the face of constitutional limitation, but is indicated as an aid to determining whether constitutional power has been arbitrarily or unreasonably exercised or the balance between individual interests and the public welfare destroyed.

We pass without consideration the arguments advanced to show that the law is unreasonable or arbitrary with respect to the rights of sureties or unsecured creditors. The appellant is not a surety, nor does the record disclose that its debt is secured otherwise than by mortgage. Neither is it an unsecured creditor. Having offered to pay to the trustee for the mortgaged property an amount equivalent to the total of the mortgage debt and to step out of the bankruptcy proceedings with its mortgages fully discharged, it may become an unsecured creditor if at all only by the failure of its assault upon the statute, and then to the extent of the deficiency that may result after purchase by the bankrupt at appraised value. It is settled that the constitutionality of a statute may be considered only when the justification for some direct injury suffered or threatened presenting a justiciable issue is made to rest upon the enforcement of the act. See City of Allegan v. Consumers' Power Co., 71 F.(2d) 477, 481 (C. C. A. 6), and authorities there cited. The record presents no issue as between the bankrupt and unsecured creditors.

Complaint is made, however, that the statute prevents the appellant from enforcing its mortgages for an arbitrary period of five years, and this without relation to the continuance of an emergency; that the rental terms are unreasonable; that no provision is made for taxes and insurance, or for the prevention of waste; that the interest

---

[2] See, also, Corwin, No Doctrine of Due Process of Law Before the Civil War, 24 Har. L. Rev. 366, 460; Hough, Due Process of Law Today, 32 Har. L. Rev. 218.

on the mortgage debt is wiped out; that fixing the value of the debtor's property at its fair and reasonable value, not necessarily its market value, is arbitrary, unreasonable, and capricious; that all risk of decline in value is borne by the mortgagee; and, generally, that part of its debt is confiscated for the benefit of the mortgagor.

As to the first, it may be sufficient to say that any forecast as to the extent and duration of the emergency must necessarily be uncertain, and we are unable to say until "experience is available to correct uncertain prophesy" that the judgment of the Congress after hearing and deliberation is wrong. But the appellant gives no challenge to the present existence of the emergency, and manifestly can give none. We are not obliged to speculate as to validity of the statute at another time and under other circumstances. "A law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though when passed," Chastleton Corp. v. Sinclair, 264 U. S. 543, 547, 548, 44 S. Ct. 405, 406, 68 L. Ed. 841, and "it is always open to judicial inquiry whether the exigency still exists upon which the continued operation of the law depends," Home Bldg. & Loan Ass'n v. Blaisdell, supra.

The principal inquiry, however, that suggests itself in relation to the appellant's grievance, and this in respect to all of the specifications of its complaint, must concern itself with consideration of what it is in fact deprived through the operation of the challenged law. It is true that the appellant will not be able to collect the face value of its mortgages, nor the accrued interest thereon. But this is a loss it has already sustained, not through the operation of the statute, but through the default, insolvency, and bankruptcy of its debtor. But for the bankruptcy, it would still have its right to foreclose and to bid in the property. It is by the measure of that right that the reasonableness of section 75 must be judged. The appraisers have declared, and the court has found, that the fair value of the mortgaged property is $4,445. The fairness of the appraisal is not attacked. That the appellant offered to buy the property from the trustee for an amount equal to the mortgage debt is of course beside the point. Such offer can have no possible bearing upon the fair value of the property. It is this value that forms the base for the price the bankrupt is to pay upon the exercise of his option. True, the mortgagee, upon bidding in the property under foreclosure, has the expectation that by holding the property for a time values may be restored, and it may recoup part or all of its loss. The statute does not take from him this opportunity. It provides for a reappraisal at the end of five years—the option period—upon the mortgagee's request, and the debtor must pay the reappraised price or the original appraised value at the mortgagee's option. If in composition proceedings nonassenting creditors may be compelled, without valid constitutional objection, to accept in discharge of their claims their pro rata share of the fair value of the bankrupt's assets— if under the doctrine of Van Huffel v. Harkelrode, supra, it is "obviously constitutional" to transfer the creditor's lien from the bankrupt's property to the proceeds of its sale—we can see no constitutional bar to the substitution for the value of the appellant's right to foreclose the fair value of the mortgaged property.

 But the appellant complains that the provisions for appointment of appraisers is arbitrary and unreasonable, and that the appraisal of the security at its "fair and reasonable value, not necessarily its market value," somehow offends against due process. It has never been thought that, in the taking of private property for public use under the power of eminent domain, an award made by a jury or commissioners [3] under the supervision of a court violates the due process clause or results in taking private property without just compensation. The appraisals are by paragraph (1) of section 75 (s) of the act, 11 USCA § 203 (s) (1), subject to the right of exceptions, objections, and appeal, in accordance with the act. This obviously means the Bankruptcy Act of which the Frazier-Lemke Act has become a component part. If there is any doubt about this, construction must under familiar principles of statutory interpretation be arrived at to the end that validity rather than invalidity results. An appraisal at "fair and reasonable value, not necessarily market val-

---

[3] Due process does not require a jury trial if one would be inappropriate. Ex parte Wall, 107 U. S. 265, 289, 2 S. Ct. 569, 27 L. Ed. 552; Maxwell v. Dow, 176 U. S. 581, 20 S. Ct. 448, 494, 44 L. Ed. 597.

ue," must necessarily mean that market value is the minimum value to be found beyond which other circumstances may be considered to arrive at "fair value." It is inconceivable that an appraisal aiming at fair value will ever be lower than market value, or, if so, would stand the test of judicial review.

When the appellant complains of its loss of interest during the option period, or the insufficiency of the rental to pay taxes, insurance, and repairs, it still speaks in the terms of the mortgage covenants rather than with an evaluation of its remedies for broken contracts, and is tilting at economic distress rather than at the reasonableness of the challenged statute. The foreclosure that is stayed would have brought it no interest, and reasonable rental value has always been the compensatory equivalent for deprivation of the use of property in the eyes of the law. Nor is there substance to the grievance that the property will be seized for taxes and deteriorate through waste. Rentals are to be paid to the bankruptcy trustee, who is still under the supervision of the referee and the court. There is no warrant for the assumption that the trustee may or will be permitted to be less diligent with respect to his duties than with bankrupt estates generally. Moreover, the property is by subsection (b) of section 75 (11 USCA § 203 (b) placed under the supervision of the conciliation commissioner, and the rights of the appellant to invoke the protection of the bankruptcy court as a court of equity are not less under the assailed statute than are those of mortgagees or lessors generally.

Finally, the grounds of complaint are in many respects similar to those upon which the constitutionality of section 77 of the Bankruptcy Act, 11 USCA § 205 (providing for corporate reorganizations) has been assailed. While we express no opinion upon the validity of that section, the constitutionality of which will presently be passed upon by the Supreme Court, it is important to note that, so far as its provisions are similar to those here considered, they have not generally been considered incompatible with validity. In re Chicago, R. I. & P. R. Co., 72 F.(2d) 443 (C. C. A. 7). Compare In re Landquist et al., 70 F.(2d) 929 (C. C. A. 7).[4]

The decree below is affirmed.

---

[4] See, also, vol. 21 American Bar Ass'n Journal, 47; 12 N. Y. Univ. Law Quarterly Rev. 196. 44 Yale Law Journal 197 (December, 1934); 32 Mich. L. Rev. 221. Also as to § 75, 48 Harv. L. Rev. 332 and 29 Ill. Law Rev. 645.

