**In re PLUMER.**
No. 823.

District Court, S. D. California, S. D.
Feb. 21, 1935.

Richard F. Kahle, of San Diego, Cal., for debtor.

NETERER, District Judge (after stating the facts as above).

As to the first objection, the bankrupt was and is without any doubt a farmer within the intent of section 75 (s), Bankruptcy Act, as amended (Frazier-Lemke Act), 11 USCA § 203 (s). He lived on the 153-acre farm at issue from the time of purchase in 1930, and steadily, with his family, after April, 1933. His bona fide engagement was farming. He cared for from twelve to seventeen acres of fruit orchards; cultivated and pruned the orchard, harvested the crop on the land when he bought it at a loss, however, of $500, and marketed all the crop then and since, and cropped a small portion of the land personally, but because of the market conditions since, for hay and barley, for which the land was suitable, the expenses for cropping was more than it could be sold for on the market, and the land has not been extensively cropped; the drouth during the year 1933 was unprecedented, and he leased a part of the land in 1933 to another for $75 for the season. He secured for planting 17,000 grape cuttings and heeled them in for planting the following spring, but because of the drouth it was not wise to plant them, so he separated the bundles, 100 cuttings in each bundle, and put the cuttings separately in ditches which he dug along the river bed and watered them during the season, all cuttings now being well rooted and ready for planting. He dug a well "with four hundred lateral holes," at a cost of approximately $3,000. He fixed the "washes" and cleared off brush, hauled rock, repaired the house, and built garage and cut wood. The drouth during 1933 caused the death of 700 fruit trees. The debtor, since adjudication and order of possession, and setting aside exemptions, has removed 700 dead fruit trees, has plowed 70 acres, and is plowing thirty additional acres, all for cropping in 1935, and planting of the 17,000 grape cuttings. The bankrupt was and is a bona fide farmer within the purview of the act.

As to the second objection, section 75 (g), 11 USCA § 203 (g), "An application for * * * extension proposal may be filed * * * after but not before * * * (1) it has been accepted in writing by a majority in number of all creditors." Acceptance being refused, filing was express-

Hamilton, Lindley & Higgins, of San Diego, Cal., for petitioner.

ly negatived by the act. That proposal was made and refused is not denied. The farmer was qualified to amend his petition and be adjudicated a voluntary bankrupt.

The third and fourth objections will be considered together. The Congress for the common good set forth a plan by which the farmer, unable to pay his debts as they mature, may invite the creditors to conference by presenting to the judge a petition with an inventory of his property and statement of his debts, and if the petition is approved, it is filed and referred to the Conciliation Commissioner, who calls a meeting of the creditors, and the farmer presents his plan; if the creditors agree to the plan in writing, it is filed, and the debtor and creditors proceed voluntarily with the composition. If the creditors do not agree, the effort of the composition ends. Every creditor is left to exercise his own free choice.

Failure to obtain the required acceptance in writing qualified the farmer to be adjudged a voluntary bankrupt, and his estate passes to the control of the bankruptcy court. The farmer may have his property appraised, exemptions subject to liens set aside, and allowed to remain in possession under control of the court, upon payment of taxes and interest, keeping premises free from waste; and by the act, the lien is extended to cover all rentals received as well as increase in live stock held under mortgage. Under the provisions of the amendment, the land must be appraised at its *fair* and *reasonable* value. (1) Either party may object to the appraisal and has right of appeal within one year of date of order approving the appraisal. The trustee, with consent of lienholders, may sell to the debtor, aside from the exemptions, the remainder of the estate upon terms set out. On default in the payments, or other conditions, the secured creditor or trustee may enforce the pledge or lien in accordance with law. Any affected creditor may file written objections to the manner of payment and distribution, and thereupon the court, having set aside the exemptions, shall stay all proceedings for five years, during which time the debtor shall remain in possession and under the court's control, providing the debtor pays a reasonable rental annually, taxes, etc., and commits no waste. Upon the request of any lienholder, the court shall cause a reappraisal, and, no doubt, an appeal from such reappraisement may be made to the court,

as the entire Bankruptcy Law (11 USCA) must be looked to, all the parts together, in their relation to the end in view. Red Bird v. U. S. (Cherokee Intermarriage Cases), 203 U. S. 76, 89, 27 S. Ct. 29, 51 L. Ed. 96; Talbott v. Board of Com'rs of Silver Bow County, 139 U. S. 438, 443, 11 S. Ct. 594, 35 L. Ed. 210; Billings v. U. S., 232 U. S. 261, 34 S. Ct. 421, 58 L. Ed. 596.

And by the same token the provisions of the Bankruptcy Law for notice and hearing on petitions for discharge apply to the phrase "May apply for discharge."

When the Constitution was adopted, agriculture was the backbone of the nation. We became industrialized about 1890, and in a limited way began mass production in 1909. At the close of the World War, when we thought we were turning our spears into pruning hooks and beating our swords into ploughshares, our large war material manufacturing plants changed to mass production plants. Every product from razors to radios, ploughs to threshing machines, bathtubs to automobiles, were mass produced. Billions of dollars of conditional sales contracts were negotiated by high-powered salesmen. Farms were mortgaged. We were in an age of progress and, for the moment, prosperity. Wildcat speculation was inspired in a large measure by leaders in finance. We were in an age of gas and speed, jazz and bare legs. Automobiles raced in the highway and jostled each other in the street. We found a small percentage of the people controlled a large percentage of the wealth of the country. Loans were called. Banks failed, etc. A condition was presented which the wildest dreams of the Constitution makers could not sense. A condition, however, which was provided against by Divine inspiration and "prophetic vision" by article 1, § 8, and general welfare clause of the Constitution. We are changed from an agricultural country to an industrial country.

That this amendment is an emergency measure, and for a limited period, and is germane to the basic principles of the Constitution, *life, liberty, and the pursuit of happiness,* is expressed as to the first, and obvious as to the second. Liberty to enjoy honest labor and freedom in avenues of human endeavor in improved conditions related to other employments for separate benefits from economic gains and related enterprise for the common good, in maintenance of the economic political system, tempered by social conscience to conserve

life and promote the general welfare, inspired the emergency relief. This concept moved the Congress to exercise what Chief Justice Marshall in Sturges v. Crowninshield, 4 Wheat. (17 U. S.) 122, 4 L. Ed. 529, denominated "extensive discretion." The Congress was presented with a "condition and not a theory." It sought to ameliorate public stress, in neutralization of threatened danger, violence, defiance of process, closing public schools at and prior to the enactment in issue. The court knows that threatened danger verging on insurrection did obtain before and at the time of this enactment throughout various farming zones in the United States. Chicago, Mil., St. Paul & P. R. Co. v. Hedges (D. C.) 5 F. Supp. 752.

■ The Constitution delegates to the Congress "the * * * Power * * * to establish * * * uniform laws on the subject of bankruptcies throughout the United States." Article 1, § 8, cl. 4, Constitution. Under this section, the bankruptcy laws have had a steady progressive growth to reach the current need and afford relief where the common good demanded. The acts were passed in 1800 (2 Stat. 19), 1841 (5 Stat. 440), 1867 (14 Stat. 517), 1874 (18 Stat. 178), 1898 (11 USCA § 1 et seq.), and the enactments 1933, 1934 in issue. Each act is a progressive advancement and extension of benefits to meet the need in the unfolding social economic relation between the individuals (debtors and creditors) and the public general welfare. That the Frazier-Lemke (section 75 (s) Amendment, 11 USCA § 203 (s) is uniform throughout the United States is obvious.

Fundamentally the same question here in issue was decided by the Supreme Court in Traer v. Clews, 115 U. S. 528, 6 S. Ct. 155, 29 L. Ed. 467. The amendment is germane to the subject of bankruptcy and is within the granted plenary power of the Congress, and this power is not exhausted by one act, but may be invoked when present needs, standards, and wisdom and justice require. In re Landquist (D. C.) 70 F.(2d) 929. In re Radford (D. C.) 8 F. Supp. 489, 26 A. B. R. (N. S.) 47. The power of the Congress being fixed, and the act being temporary, the validity is established. Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77. The purpose of the act being temporary, and, as such, is justified. Wilson v. New, 243 U. S. 332, 345, 346, 37 S. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024. "A limit in

time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change." Block v. Hirsh, 256 U. S. 135, 41 S. Ct. 458, 460, 65 L. Ed. 865, 16 A. L. R. 165. The Congress had the power to authorize adjudication, on fixed conditions, on voluntary petition. Hanover National Bank v. Moysès, 186 U. S. 181, 22 S. Ct. 857, 46 L. Ed. 1113.

Machinery is provided to protect the security, in the circumstances to secure to the mortgagee a reasonable income (section 75 (s) (3) in value in terms of commodity value and payment of debts relating to tradesman and farmer, capitalist and agrarian. "Value is the effect in exchange of the relative social desire for compared objects expressed in terms of a common denominator." International Harvester Co. v. Kentucky, 234 U. S. 216, 222, 34 S. Ct. 853, 855, 58 L. Ed. 1284.

When this $10,000 loan was made, it was no doubt on the security of the land, and it may reasonably be assumed at a valuation of not more than 25 per cent. to 40 per cent. of the land value; if 25 per cent., the petitioner valued the land at the time the loan was made at $40,000; if 40 per cent., at $25,000. The land shrunk in market value without fault of the farmer to the appraised value of $15,750. The effect in exchange of the mortgage debt value for relative objects desired, expressed in terms of dollars, is many times its value with relation to the land than when the mortgage was made five years ago. The farmer lost, if the first valuation is taken, $24,250, and the second, $9,750, and if the land is forced to immediate sale by the trustee, or execution on foreclosure, it probably would not sell for the amount of the mortgage unless bid in by the security holder, and the farmer and general creditors will lose all. (These figures were used only as an illustration. The same relation of loan and farm obtain no doubt on the same relative basis on other mortgaged lands.) Petitioner in his brief says, "This is not bankruptcy, but robbery," should the act be "To cut the forfeiture from that bankrupt there." "Trifling installments" to a creditor of millions may be a fortune to a bankrupt farmer.

If both creditor and debtor are held in status quo, the farm kept from wasting, taxes paid, reasonable interest in value, and rental paid to the creditor, the creditor will be paid in full; it cannot lose, for the land is appraised in this case for more than its

secured debt, and the farmer will, to some extent, be rehabilitated by the approaching normal economic conditions, and all will be for the common good instead of the farmers and their families being set upon the public highway as beggars, and the petitioner having a farm worth two and one-half to four times as much in proportion to the loan as when the loan was made, not calculating the improvements placed on the land since the execution of the mortgage, and the mortgagee, not desiring the land for farming, would militate against the general welfare, aside from the granted powers to the Congress. Article 1, § 8, Constitution.

The legislation was directed to protect basic interest of society, a legitimate end, and not to the benefit of particular individuals. The purpose is an equitable and feasible method of liquidation throughout the United States for the best interest of all creditors and financial rehabilitation of the farmer. When the general welfare is approved and the power of the Congress is established (article 1, § 8, Constitution), the necessity and sufficiency of the act is obvious. "But while it is unjust to pursue such profits from a national misfortune with sweeping denunciations, the policy of restricting them has been embodied in taxation and is accepted. It goes little if at all farther than the restriction put upon the rights of the owner of money by the more debatable usury laws." Justice Holmes in Block v. Hirsh, supra.

If every security holder would foreclose his farm mortgage "To have the due and forfeit of my bond," the farmer could not redeem and would be compelled to accept the term of the security holder who has full hold to the land, worth in terms of commodity value much more than the loan, when the loan was made, and continue as a tenant, and lose initiative and independence, or his family cast in the public street as mendicants. The act affects not an individual, but many millions. The act, while beneficial to the farmer, is equally beneficial to the security holder. Destroy the farmer, and the foundation of the government is shaken; impair the government, and value of the security is impaired. The constitutional limitations and grants of power of the Congress are read into the contract in order to fix the obligations of the parties; so, also, is the grant of power and the essential attributes of reserved sovereign power as a postulate of the legal order.

Home Building & Loan Ass'n v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 241, 78 L. Ed. 413, 88 A. L. R. 1481. Chief Justice Marshall, in M'Culloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579, said: "We must never forget, that it is a constitution we are expounding, * * * a constitution intended to endure for ages to come, and, consequently, to be adapted to the various crises of human affairs." In State of Missouri v. Holland, 252 U. S. 416, 433, 40 S. Ct. 382, 383, 64 L. Ed. 641, 11 A. L. R. 984, the court said, "We must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters. * * * The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago," and there may be added, in accordance with present standards of wisdom and justice. Chief Justice Hughes in Home Building & Loan Ass'n v. Blaisdell, supra, said: "The question is no longer merely that of one party to a contract as against another, but of the use of reasonable means to safeguard the economic structure upon which the good of all depends." Mr. Justice Brewer, in Long Island Water-Supply Co. v. Brooklyn, 166 U. S. 685, 692, 17 S. Ct. 718, 721, 41 L. Ed. 1165, quoted by Chief Justice Hughes in Home Building & Loan Ass'n v. Blaisdell, supra, said: "But into all contracts, whether made between states and individuals or between individuals only, there enter conditions which arise, not out of the literal terms of the contract itself. They are superinduced by the *pre-existing* and *higher authority* of *the laws of nature,* or *nations,* or of *the community* to *which the parties belong.* [Italics supplied]. They are always presumed, * * * to be known and recognized by all, are binding upon all, and need never therefore, be carried into express stipulation, for this could add nothing to their force. Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount, wherever a necessity for their execution shall occur."

■ The powers of the Congress are limited in number, but not in degree. U. S. v. Cruikshank, 92 U. S. 542, 545, 549, 23 L. Ed. 588. The powers being granted (article 1, § 8, Constitution), the exercise thereof is limited only by present needs and standards of wisdom and justice. Mitchell v. Clark, 110 U. S. 633, 4 S. Ct. 170,

312, 28 L. Ed. 279; In re Cope (D. C.) 8 F. Supp. 778, 26 A. B. R. (N. S.) 549; In re Franklin Brewing Co. (C. C. A.) 249 F. 333; In re Radford, supra (D. C.) 8 F. Supp. 489, 26 A. B. R. (N. S.) 473, affirmed Louisville Joint Stock Land Bank v. Radford (C. C. A.) 74 F.(2d) 576; In re Landquist (C. C. A.) 70 F.(2d) 929.

The purpose of the act is to arrest the assets of the farmer, hold them in custody legis, and conserve the estate for beneficial disposition within a limited period, "to permit all creditors to share in the distribution of the assets * * * and to leave the honest debtor thereafter free from liability upon previous obligations." Central Trust Co. v. Chicago Auditorium Ass'n, 240 U. S. 581, 591, 36 S. Ct. 412, 415, 60 L. Ed. 811, L. R. A. 1917B, 580.

The purpose of the Congress could only be achieved through the Bankruptcy Act, §§ 74, 75, 77B, amendments, 11 USCA §§ 202, 203 and 207. This affords the farmer and his creditors a period of grace, that they, by functioning in harmony with the provisions of the act, and the approaching end of the depression, when the commodity dollar will more nearly equal the debt dollar, may conserve the estate, and not by immediate sacrifice wreck the whole estate. In re Philadelphia Rapid Transit Co. (D. C.) 8 F. Supp. 51, 26 A. B. R. (N. S.) 491, 496. See, also, In re Radford (D. C.) 8 F. Supp. 489, 26 A. B. R. (N. S.) 473, recently affirmed Louisville Joint Stock Land Bank v. Radford (C. C. A.) 74 F.(2d) 576. The Attorney General's Report for the fiscal year ending June 30, 1931, shows liabilities scheduled in bankruptcy to be over $1,000,000,000, and dividends paid less than 10 per cent.

The act deals with an actual condition, and the complexity of economic conditions make it impossible to fix a line, but must be determined by precedent conditions, on the civil relations and extended affected zones, domestic and foreign, coupled with application of reasonable probability and common sense to do justice to both contractural parties and common good, and for the equal distribution to all creditors with respect to the secured and common claims must be recognized if business is to go forward and government continue, and to that end men and industries must unite, not in bearing one another's burden, but in each bearing his or its own burden for a brief time caused by the economic stress, the fault of neither or all, and which the common good, the general welfare, requires. Chief Justice Hughes in Home Bldg. & Loan Ass'n v. Blaisdell, supra, at page 442 of 290 U. S., 54 S. Ct. 231, 241, said: "It is always open to judicial inquiry whether the exigency still exists upon which the continued operation of the law depends." The existence of the emergency is not challenged.

The farms must be cultivated, the crops raised are a treasure necessary to life of the people and live stock of the nation, and without which the nation cannot survive; and millions of farmers are thus engaged and affected, and the industry was paralyzed by mortgage foreclosures, entering of deficiency judgments, evictions, etc., in various farming districts in the United States, when the act was passed, and the bankruptcy jurisdiction extended, and reasonable provision made to safeguard all interests under the supervision and guidance of the bankruptcy court. The food must be raised and distributed to promote the common good. The Department of Agriculture Technical Bulletin No. 288, February, 1932, pp. 22, 23, and the Year Book of the same Department, 1932, p. 913, judicially known to the court, show that insurance companies, banks, and investment companies predominate as holders of such securities as covered by the act in issue. Such holders are not seeking to engage in farming, but their chief concern is protection of their investment. Chief Justice Hughes, Home Bldg., supra.

The Constitution is not self-destructive, and that the plenary power granted by article 1, § 8, in extensive terms, is not destroyed or restricted by the Fifth Amendment, and the Congress rendered impotent as to the Frazier-Lemke Act, especially as to the due process clause of each amendment. McCray v. U. S., 195 U. S. 27, 24 S. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561; Billings v. U. S., 232 U. S. 261, 282, 34 S. Ct. 421, 58 L. Ed. 596.

The act in issue gives the creditors their "day in court" at every step of the proceedings, and they may by "evidence and argument (Southern Ry. Co. v. Virginia, 290 U. S. 190, 54 S. Ct. 148, 78 L. Ed. 260) * * * challenge the result. There is no denial of due process, though the proceeding is shot through with irregularity or error." West Ohio Gas Co. v. Public Utilities Comm., 55 S. Ct. 316, 320, 79 L. Ed. ——, filed Jan. 7, 1935. Nor is

the contract set aside nor the lien abrogated. The remedy is not unreasonably changed. The private sale proposal after appraisement is such as is provided by many state Legislatures, and followed by courts, probate and equity, and is a procedure the Congress has the power to make. *Real* value in such circumstances is more than market value. While the foregoing disposes of every issue, emphasis is placed by the debtor, and it may be added that 11 USCA § 203 (s), provides that decree of adjudication on the voluntary amended petition, October 3, 1934, with relation to powers and duties of court and officers, farmer and creditors, and property, as if adjudication had been made on March 3, 1934, the date the petition was filed. This petition to set aside adjudication was filed January 9, 1935, eight months and seven days after petition was filed, and three months and eight days after the order of adjudication was entered. The petitioning creditor appeared and participated in the proceedings before the Conciliation Commissioner, and in the proceedings before the referee in bankruptcy; on denial of relief, petitioning creditor prayed certification of all proceedings to the District Judge and later filed this petition. A creditor may not participate in the administration of a bankrupt estate until he considers it to his disadvantage and then challenge the proceedings. The creditor must select his course, and, when selected, may not change. He must also move promptly. In re Commonwealth Lumber Co. (D. C.) 223 F. 667; First National Bank of Belle Fourchee (C. C. A.) 152 F. 64, 11 Ann. Cas. 355; In re Broadway Savings Trust Co. (C. C. A.) 152 F. 152; In re T. E. Hill Co. (C. C. A.) 159 F. 73; Rudebeck v. Sanderson (C. C. A.) 227 F. 575; Mason v. Dean (C. C. A.) 31 F.(2d) 945; In re New England Breeders' Club (C. C. A.) 169 F. 586. The creditor is therefore estopped from pressing its petition.

■ The bankruptcy court has jurisdiction, and postponing distribution for five years upon the contingencies stated does not militate against it. It does not deprive security holders of any substantial right within reason and common sense, nor violate the Fifth or Tenth Amendments of the Constitution. Should any doubt be entertained as to the constitutionality of the act, it is the court's duty to resolve that doubt in favor of the power exercised by the Congress. U. S. v. Delaware & H. Co., 213 U. S. 366, 407, 29 S. Ct. 527, 53 L. Ed. 836.

The principle in this case is not unlike, and by analogy is germane to, that in State of New Jersey v. New York, 283 U. S. 336, 51 S. Ct. 478, 75 L. Ed. 1104, where the waters of the tributaries of the Delaware river were claimed as vested in New Jersey, and appropriation of part thereof by New York was claimed by New Jersey and deprived it of its property without due process, but the Supreme Court held otherwise. A like issue in Greeson v. Imperial Irr. District, 59 F.(2d) 529, 533, in which the Circuit Court of Appeals for the Ninth Circuit said: "The instant issue is not one alone affecting an individual citizen or his separate property. The water of the river is a treasure that offers necessity of life to at least several millions of people, and must be apportioned in harmony with the provisions of law, in equality of right and equity." The food raised on the farms affected is not canalized, but, like water, is the life-sustaining substance and serves a great many more million people, and the Congress did not wrongfully impose on the security holders any material loss.

■ Extending administration in bankruptcy for five years upon the conditions named in the act is not in the circumstances unreasonable, and is within the delegated power to the Congress, and inherent equitable powers of the court.

To analyze and distinguish the numerous cases cited would unduly extend this memorandum, and would serve no useful purpose.

The petition is dismissed.