**WESTCHESTER FIRE INS. CO. v.
BUFFALO HOUSEWRECKING
& SALVAGE CO.**

District Court, W. D. New York.

Aug. 22, 1941.

See, also, D.C., 32 F.Supp. 214.

Purdy & Lamb, of New York City (Edmund F. Lamb, of New York City, Brown, Ely & Richards and W. Alexander Eldridge, all of Buffalo, N. Y., of counsel), for libellant.

Wilcox & Van Allen, of Buffalo, N. Y. (Selby G. Smith, of Buffalo, N. Y., of counsel), for respondent.

KNIGHT, District Judge.

Libellant brings this suit in admiralty to recover damages sustained by the barge, Frank J. Fobert, and insured by the libellant and for which the libellant has paid the owner of the barge for a total loss.

The respondent and the Michigan-Atlantic Corporation entered into an agreement whereby the Michigan-Atlantic Corporation agreed to carry a certain tonnage of turnings and borings from New Haven, Connecticut, to Buffalo, New York. The respondent had purchased these turnings and borings from H. Kasden & Son, who were to deliver them to the respondent f.o. b. barges. The employees of H. Kasden & Son loaded the turnings and borings aboard the barge Frank J. Fobert the latter part of July, 1937, in the presence of Paul Gilman, captain of the barge, and John J. Ilecki, an inspector of the respondent. Also present during some of the loading was Samuel Kasden, vice-president of H. Kasden & Son. The employees of H. Kasden & Son, under the direction of their foreman, spread soda ash and lime over the bottom and the side of the hold, raked over the turnings and borings with the use of forks and hooks and also spread the soda ash and lime over every two to four tons

of the material as it was being loaded. After the barge was loaded, the hatches were battened down and not reopened until the barge reached Lyons, New York, on August 13, 1937.

The bill of lading contained the provision that the shipper should be liable in the event that the cargo was dangerous, unless "full written disclosure" of its character were made to the carrier. No notice that the cargo was dangerous was given.

The barge proceeded from New Haven, Connecticut, to about six miles east of Lyons, New York, without any mishap. There the captain noticed the intense heat of the barge and upon opening the pump hatch discovered flames in the hold and directed the captain of the tow tug to proceed to Lyons, New York.

Upon arrival at Lyons, New York, Gilman, the tug captain, notified the insurance representatives, the owners of the barge, and the Lyons' Fire Department. The fire department spread the cargo with some chemical which extinguished the flames, but which left the cargo smoking. Thereafter the fire department left and at 1 A. M. the following day, the insurance representative and representatives of the owner left and instructed Gilman to watch the barge and to report to them any change in the condition of affairs. Gilman went to sleep and awoke about 6 A. M. on August 14, 1937, and discovered the barge on fire. He then notified the insurance representatives, his owner's representative, and the fire department. The fire was extinguished with water by the fire department. Later the cargo was removed from the barge. Upon inspection by the representatives of the insurance company, the barge was found to be in such condition that it was declared to be a total loss, and it was thereafter abandoned. The cargo of the barge was shipped and eventually received by the consignee, the Hanna Furnace Company at Buffalo, New York. The above statement of facts is not in dispute.

It is the claim of the libellant that the respondent breached the contract of affreightment by shipping dangerous goods and thereby became liable to the barge owners for the loss of the barge; that there is an implied warranty that the cargo was not dangerous; that apart from the contract of affreightment, the respondent is liable in negligence in shipping a dangerous cargo without notice of its character.

■ The respondent urges that the libellant has not the right to sue because the damages alleged exceed the insurance paid. It is alleged in the libel that the libellant paid the barge owner for a total loss. Under such circumstances the libellant was subrogated to the barge owner's rights and hence could sue. 2 C.J.S., Admiralty, 187, § 94; Liverpool Steam Co. v. Phenix Insurance Co., 129 U.S. 397, 9 S.Ct. 469, 32 L.Ed. 788. Respondent cites Fairgrieve v. Marine Insurance Co. of London, 8 Cir., 94 F. 686, but in that case the value of the property destroyed exceeded the insurance paid. The holding there was that the insured could recover the full value of the property for his own benefit and as a trustee for the insurer.

■ It is further urged by the respondent that there is no liability because the Michigan-Atlantic Corporation issued the bill of lading and contracted with the respondent to carry the cargo in question. The insured, the Michigan-Atlantic Corporation, and Canal Operating Co., Inc., had an agreement under which the insured was to furnish barges for affreightment, the Canal Operating Co. Inc., to furnish power for towing and the three to share in certain percents of the receipts from transportation. The cargo in question was delivered on board the Fobert by the seller and respondent contracted with the Michigan-Atlantic to transport the cargo. The agreement between the owner, Michigan-Atlantic and Canal Operating Co. Inc., constitutes a joint venture. Such being the case, the owner could sue, and the insurer could sue. The Hugh O'Donnell, D.C., 22 F.2d 410; In re O'Donnell, 2 Cir., 26 F.2d 334; 3 C.J.S., Agency, 209, § 276.

It is also urged by the respondent that the condition of the cargo was fully disclosed, obvious and known to the carrier; that it was not of a dangerous character, and that it was properly loaded.

■ The respondent also claims that it is not liable because the loading was done by the Kasden Company, the seller, at its expense and for its account, and that the purchaser cannot be held responsible for lack of proper precautions in loading the cargo or upon any theory that he allowed the cargo to be loaded in the condition claimed. The respondent was the shipper of the cargo and he was so designated in the bill of lading. Further, the cargo had been purchased some months prior to delivery on board the barge and an officer of the libellant and an employee of the respondent were present to supervise the delivery. Under the circumstances shown, respondent was the shipper of the cargo.

■ Whether the respondent is liable for breaching the contract of affreightment depends upon the question of whether this cargo was a "dangerous" cargo. If it was, written notice of its character was necessary. The bill of lading specifically required this and there is no proof of any waiver. Turnings and borings, the materials in question, as such, admittedly are not "explosives" or "dangerous" goods. They are well known articles of commerce. As stated by the libellant, "Dry turnings and borings free from oil, oily waste and rags are not dangerous to carry * * *." Upon the trial the libellant offered in evidence Pamphlet No. 7 issued by the Bureau of Explosives of the United States Government. Objection to its reception in evidence was made. Decision on the motion was then withheld. In my opinion, it was competent to be received, and the objection is overruled. 18 U.S.C.A. § 383, Crim.Code § 233; Wigmore on Evidence, Third Edition, Vol. 6, p. 21; G. & C. Merriam Co. v. Syndicate Pub. Co., 2 Cir., 207 F. 515; Lehigh Valley R. Co. v. State of Russia, 2 Cir., 21 F.2d 406; The Vestris, D.C., 60 F. 2d 273. Irrespective of the introduction of the pamphlet in evidence, the court is authorized to take judicial notice of its contents. The Courts of Admiralty are not bound by all the common law rules of evidence. Benedict on Admiralty, 6th Edition (by A. W. Knauth), Vol. 3, p. 5, § 385(b); Wigmore on Evidence, 3rd Ed., 1940, Vol. 1, page 96, § 4(d); Greenleaf on Evidence, 16th Ed., Vol. 1, p. 16; 2 C.J.S., Admiralty, 259, § 136; The Eleanore, 6 Cir., 248 F. 472; In re Plumer, D.C., 9 F.Supp. 923; Atlantic Transport Co. v. Rosenberg Bros. & Co., 9 Cir., 34 F.2d 843. It is not necessary to cite the numerous other authorities supporting these views.

■ Libellant's right to recover for breach of contract of affreightment depends upon its establishing that this cargo was wet and contained an excessive amount of waste material. Otherwise, the carrier by its acceptance of the cargo as evidenced by the bill of lading and the receipt of the master of the barge without any notations or entries thereon is estopped from alleging that the goods were not in good condition

when received by the carrier. The carrier has, by its own acts, elected to accept the cargo as a cargo in good condition when it might have accepted it subject to the conditions they allege they found existing. 13 Corpus Juris Secundum, Carriers, 236, § 123, see note 36. The evidence shows the existence of some waste materials and of some moisture. However, the findings of the Bureau of Explosives as embodied in Pamphlet No. 7 reads:

"Iron turnings, borings, filings, when in large bulk, have a fire hazard, as they oxidize spontaneously if wet, and the oxidation may produce enough heat for ignition. This risk is not sufficient to cause material to be classed as inflammable by ICC regulations and material is accepted by steamship companies".

■ There is nothing here to show that this cargo was in any way regarded as a dangerous cargo. However, it would seem that any cargo of iron turnings, borings, filings, when in large bulk, has a fire hazard, that there is danger from spontaneous combustion, "turnings or borings * * * will develop heat to some extent under favorable conditions. If there is no oily cotton or other fabric, the liability to spontaneous heating to any dangerous degree is extremely slight", Pamphlet, supra, and this must have been known to the carrier. The cargo was an average cargo and no more dangerous than cargoes of similar nature and as such should have been treated with an appropriate degree of care by the carrier. This, of course, is speaking of the materials in question as not containing an excessive amount of waste material.

The evidence discloses that these turnings and borings were taken from a pile of turnings and borings which had been standing on a pier for months preceding the shipment in question; that a period of hot weather had immediately preceded; that another cargo from this same pile was loaded and transported without damage in a barge in the tow of the barge in suit; that the materials in question were first moved from the pile on to the dock and from there transferred to the hold of the barge by a crane and shovel; that the bottom and sides of the hold were covered with soda ash and lime mixed as a preventative against combustion; that at least ten men were engaged in raking over and taking out any waste material in the cargo throughout the loading; that this soda ash and lime was spread throughout the cargo as it was loaded. There is other evidence to support the contention that this cargo when loaded did not contain any excessive amount of moisture or waste material. Substantially the only evidence to the contrary is found in the testimony of the captain of the barge and the admitted fact that fire did occur in this cargo. The testimony of the captain as to the conditions on loading is such as does not merit belief. He testified that "when the bucket was loaded" from the pile the water ran out "as big as my hand"; that he watched the loading "every moment * * * because the cargo was going in there wet; that was what I was watching". He knew the danger of a wet cargo because he knew "that stuff (the cargo) starts to steam and if you open the hatches it gives it a draft and then it burns * * *". He kept the hatches closed "to keep outside air out" and "to keep the cargo dry". Yet despite all of this knowledge he did nothing further, as he testified, than to mildly protest. He testified that after the fire he saw "foreign substances * * * only in a few places where the stuff was burned up". He makes no claim that he saw any waste material left in the cargo when it was being loaded. It is incredible that knowing the possible results from the conditions which he describes that he would take no further action to prevent its continuance. As against his testimony, an officer of the Kasden Company and the representative of the shipper, who saw the loading, testified that this cargo containing some moisture was not wet and that it was substantially free of waste material.

A surveyor representing the hull underwriters testified that after the fire he found in the cargo rags and oily materials, and there were received in evidence samples claimed to have been recovered by him. His testimony with reference to the amount of such material is not specific. While others, including a representative of the carrier, were present, none have been called to corroborate his statement save the bargee who testified as above stated. The surveyor was an interested party. The contract of affreightment was not breached.

■ There is an implied warranty by the shipper that the goods are fit for carriage in the ordinary way and are not dangerous. Scrutton on Charterparties and Bills of Lading, Thirteenth Edition, 1931, at page 120. This rule however, does not apply

where the "shipowner knows, or ought to know, the dangerous character of the goods" (Scrutton, supra), and no obligation to give notice rests upon the shipper "when the shipowner or his agent has full opportunity of observing the dangerous character of such goods", Scrutton, supra. Carver on Carriage of Goods by Sea, Eighth Edition, 1938, § 269. Full opportunity to observe the cargo was given.

The cases cited by the libellant upon this point are distinguishable. In Pierce v. Winsor et al., 19 Fed.Cas. page 646, No. 11,-150, the article was new in commerce; the dangerous character was unknown both to the shippers and to the owners, and no fault was imputed to either. In The Santa Clara, 2 Cir., 281 F. 725, the cargo was held to be not in compliance with the charter. In International Mercantile Marine Co. v. Fels et al., 2 Cir., 170 F. 275, 18 Ann.Cas. 18, it was held that there was a disclosure of the nature of the shipment and that other notice was not necessary. In Brass v. Maitland, 6 E. and B. 470, at page 482, "The carrier has no right to expect any communication respecting the nature of the goods where he may himself discover it," it was said.

In this view it is not held that the bargee was an agent whose acts bind the carrier. Numerous cases have held that the captain of a barge is not such an agent, but that his duties were such as those only of an ordinary seaman on a larger vessel. Hastorf Contracting Co. v. Ocean Transportation Corp., 2 Cir., 4 F.2d 584; The Harry F. Hooper, D.C.E.D.N.Y.1940, 42 F.2d 758; Cranberry Creek Coal Co. v. Red Star Towing & Transportation Co., 2 Cir., 1929, 33 F.2d 272; Dailey et al. v. Carroll, 2 Cir., 248 F. 466, 468. These decisions seem based largely upon implied ignorance of one employed as the captain of a barge. In this case we have a captain who knew the conditions which would make the cargo a dangerous one and who later received and receipted for it. It is a close question as to whether he was not an agent. However, as stated, we do not base the matter of the opportunity of the carrier to see and observe the cargo upon the presence of the captain of the barge.

Since however, it is found that this cargo was not dangerous any finding on the question of implied warranty is not necessary.

Provided the cargo was dangerous, respondent would be liable for damages approximately caused by its negligence. Finding as we have that the cargo was not dangerous there was no negligence in the loading. As pointed out before, this type of cargo was well known; free of excessive water and waste it was not dangerous. The evidence discloses that every reasonable effort and care was taken to clear it of excessive water and waste and the carrier had full opportunity to know what it received. The fact that a fire occurred is not sufficient alone to sustain the burden of proof in the libellant as against the evidence offered by the respondent. There is some evidence that the barge leaked to some extent. It may be assumed that a fire in a cargo of this character might result from various causes.

It is my view that the libellant has not established his cause by such preponderance of the evidence as is required by law.

■ There is a further reason why I believe the libellant cannot recover. After the discovery of the fire and the extinguishing of the flames by the fire department, the bargee, insurance and owners' representatives did not make any inspection of the barge to determine whether or not it had been damaged. They elected to leave the cargo in the barge apparently smoldering and left the bargee to watch for any change in conditions and to call the fire department if the conditions became worse. However, the bargee complacently went to sleep and did not awaken until the barge was enveloped in flames. Thereafter the fire was completely extinguished, the barge unloaded and the damages ascertained. Although the bargee had imposed upon him the ordinary duty of watching the barge and the specific instructions of the insurance and owners' representatives to watch the barge, he failed to do so and fire started and the barge was damaged. Assuming the respondent to be at fault for the original fire and looking at the conduct of the bargee, insurance and owners' representatives, we can only hold that their conduct was not that of an ordinarily prudent man taking reasonable precautions to avoid the consequences of the respondent's fault. In the case of Westchester Fire Ins. Co. of New York v. Pennsylvania R. Co., 2 Cir., 96 F. 2d 133, 134, a strikingly similar situation is presented. In that case, after the barge had been damaged the barge owner did not make adequate efforts to prevent sinking. The court said in part: "On this state of

facts we think the sinking of the barge must be ascribed to the failure of the owner to take proper precautions for her safety after learning of her leaking condition. * * * Its failure to do so, or otherwise to protect its leaking barge, was a fault which relieves the appellant from liability for damage * * *. Although both the initial fault of the tug and the subsequent fault of the barge-owner contribute to the result, the later fault is regarded as the proximate cause of the sinking; hence a libelant, who has full knowledge of the consequences of a respondent's fault and thereafter neglects to take reasonable precautions to avoid them, must bear his own loss." Several cases sustain the rule of law stated.

For the reasons above stated, the libel must be dismissed.