## THE ARABIC.

### Petition of OCEANIC STEAM NAV. CO., Limited.

District Court, S. D. New York. July 31, 1929.

560

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and John K. Hartley, both of New York City, of counsel), for petitioner and steamship.

Bigham, Englar, Jones & Houston, of New York City (D. Roger Englar, Harold A. Content, and Leonard J. Matteson, all of New York City, of counsel), for claimant Clayton.

Haight, Smith, Griffin & Deming, of New York City (James McKown, Jr., of New York City, of counsel), for claimant Borton.

Loucks, Griffin, Connet & Cullen, of New York City (J. Harvey Turnure and Dorman T. Connet, both of New York City, of counsel), for claimant McCague.

Lee, Smyth & Wise, of New York City (Eugene M. Strouss, of New York City, of counsel), for claimant Taube.

Joseph P. Nolan, of New York City, for claimant Schmid.

John J. McGinty, of New York City, for claimant Finnegan.

THACHER, District Judge (after making the foregoing statement). ▮ Fault is charged in the navigation of the Arabic because the course she sailed brought her into shoal waters in the face of an approaching storm. Hindsight must not influence decision. The question is whether danger could and should have been foreseen and avoided in the exercise of due care. Under ordinary conditions, and even in very stormy weather, it was not bad seamanship for the Arabic to proceed as she did, close to Nantucket Shoals. On the other hand, for a ship so large to run into a cyclone in such waters, when the storm's approach was known in time to make the open sea, is admittedly bad seamanship. The reason for this is that in shoal waters the strength and shortness of the seas may overwhelm a large ship because of her inability to rise with one wave before the next one

breaks upon her. In the open sea the distance between the crests of the waves is sufficient to allow the vessel to ride out the most violent storm in comparative safety. And so the question of fault must depend upon what her navigators knew, or should have known, of the approach of the West Indian hurricane, before they were in the center of it in the shallow waters off Nantucket Shoals.

There were three Marconi operators employed on the Arabic. Marsh was on watch from 8 to 12 morning and evening; Gartlan from 12 to 4 afternoon and night, and Kill from 4 to 8 afternoon and morning. Thus Marsh was on duty at 10:30 a. m. and 10:30 p. m. both on the 25th and on the 26th of August. It was at these hours that the Arlington Naval Radio Station each day broadcasted weather reports and forecasts, and it was customary for vessels equipped with radio to listen for these reports in aid of navigation. In answer to counsel's question, "Did you receive any warning of the hurricane?" March answered "No," as did the other operators, but on cross-examination he was unable to say whether he received weather reports on the 25th of August or not. During the 26th all of the operators were in frequent communication with land stations, from which they obtained bearings by radio. Furthermore, weather reports, forecasts, and storm warnings were being broadcasted from the Naval Radio Stations at Cape Elizabeth, Me., Boston, Mass., and New York, N. Y., both on the 25th and on the 26th, and any one of these stations, upon request from the Arabic, would have furnished the latest weather forecasts and warnings at any time. No effort was made to obtain such information from these stations. Marsh testified that static interference was very bad on the 26th; that he could hear Arlington, but not well enough to make out the report; that he tried to get the report from another vessel, without success; and that other vessels asked him for it. One of the other operators testified that the radio was working quite satisfactorily on both days, but that no special storm warning was received. The records of radio messages received by the Arabic on this voyage were sent to London, to the Marconi Company, and destroyed after eighteen months in accordance with its business practice; the petitioner having failed to request that they be preserved.

The master, when asked if any weather reports at all were received, answered: "Well, we generally do, and probably would have done (sic) at that time. But there was noth-

ing special to take note of." This admission, the testimony of the two operators that the radio apparatus was working all right on the 25th, and the failure of Marsh to deny that weather reports were received on the 25th, coupled with the inferences to be drawn from the failure to preserve the record of messages actually received, lead inevitably to the conclusion that, if Marsh had been attentive to his duties on the evening of the 25th, he must have heard the Arlington Station broadcasting the following bulletin at 10:30 p. m. on that day: "Center of hurricane rapidly approaching Cape Hatteras, moving North, Northeastwardly. Lowest reported pressure 29.32, Manteo, N. C. Hurricane warnings are displayed from Cape Henry, Virginia, Beaufort, North Carolina, and northeast storm warnings North of Cape Henry to Boston, Mass. Caution advised vessels between Cape Hatteras and Cape Cod."

With reference to the navigation of the ship, here again the case is embarrassed by the petitioner's failure to preserve and produce the original record contemporaneously made by the officers in charge of the vessel's navigation, and this failure seriously reflects upon their testimony. The rough log was not preserved. The smooth log, which is produced, is, to say the least, a very meager record of the terrific storm which the vessel encountered. Serious bodily injuries known to have been suffered by the passengers must have impressed upon the officers of the ship, upon counsel, and upon all concerned, the importance of preserving as evidence the contemporaneous entries made in the rough log. Inference is unavoidable that this log, as well as the record of wireless communications, was closely examined shortly after the arrival of the Arabic in New York. Failure to preserve these records cannot be excused as merely careless. Under such circumstances, neglect is equivalent to deliberate design—in itself evidence of conscious fault.

Finding, as I do, that those in charge of the navigation of the Arabic knew, or ought to have known, that a hurricane was approaching the vicinity of Nantucket from the southwest as early as the night of the 25th, the conditions of wind and weather subsequently encountered are of importance in determining the question of fault in connection with her navigation. The smooth log shows that from 1 a. m. on the morning of the 26th until after noon on that day the wind was southeast and moderate until 9 o'clock in the morning. The weather was overcast, with rain from 7 o'clock on. By 11 the force of

the wind had increased to a force of 9, Beaufort scale, and by 1 to a force of 11. The barometer readings were as follows: 2 a. m., 30.01; 4 a. m., 29.99; 6 a. m., 29.94; 8 a. m., 29.84. At 8 o'clock the course was changed from S. 61 W. to S. 83 W., which brought the vessel at noon to a position of 40° 42' N. 69° 17' W., which is just off the outer edge of Nantucket Shoals. After the change of course at 8 o'clock, the barometer continued to fall, reading at 10 a. m. 29.64, and at 12 noon 29.32, when the vessel hove to in order to ride out the storm and to proceed south to deeper water.

It may well be that the fall of the barometer up until 8 o'clock in the morning was not very significant, even in view of the approaching tropical storm, but, the mercury having continued to fall to 29.64 at 10 o'clock, a careful navigator could not have failed to appreciate at some time between 8 and 10 o'clock that a very severe storm was rapidly approaching. In this connection the master's testimony is important. He testified that the vessel was headed to the southward about noon "to get into deeper water," and that up to that time there was not the slightest necessity to make any change in course. Further, he said, when asked to comment on the contention that he had failed to proceed to the open sea:

"Man proposes, and so God disposes, if you like—that is where I was trying to get—to deeper water. Yes, I put the ship South—headed to what any sensible man would have done."

"Q. And you did that when in your judgment it was the proper time to do this? A. Yes."

And, on cross-examination:

"Q. What was your idea in trying to get into deeper water? A. Well, to get a nicer sea—a truer sea, not such a short sea—the ship will ride it better.

"Q. It is much better to take a storm like that in deep than in shoal water? A. Oh, infinitely."

Later he testified:

"Q. Why did you head for deeper water? A. Because I thought it better—thought the ship would take the seas better.

* * * * * * * *

"Q. The indications were at that time" (i. e., at noon) "that you were going to run into a hurricane? A. That we were right almost in it.

"Q. Was that the first indication you had that the Arabic was approaching a hurricane? A. Yes.

"Q. You are sure of that? A. Yes.

"Q. Had you known it sooner would you have taken any different steps than you did? A. Yes, I could have headed south quicker.

"Q. You would have got out to sea? A. I would have got out to deeper water."

I am inclined to accept the testimony of the master to the extent of concluding that warnings of the approach of the hurricane were not communicated to the bridge. There can be no dispute that, had the master received such warnings, he would have proceeded to the open sea before it was too late. In the absence of such warnings, I do not think a court would be justified in dissenting from the judgment of the master, a competent and experienced navigator, that it was good seamanship to proceed on the regular course. The fault lay in the failure of the radio operators to receive, and pass on to the navigating officers, the warning which was so widely broadcasted of the approach of a West Indian hurricane. It must, however, be added that the master failed to request from the radio operators information regarding weather conditions which is customarily supplied to all vessels approaching our shores, in aid of navigation, and which was at all times available upon communication with the Naval Radio Stations.

A carrier of passengers on the high seas is held to the exercise of the highest degree of care. If the reports from the Arlington Station were not in fact received, effort should have been made to obtain the information from other stations. It is not enough to say that such information is usually unimportant in the navigation of a large vessel and that the old instruments are sufficient without resort to the modern means of radio communication. Had the effort been made, the dangers encountered would certainly have been foreseen, and there would have been ample opportunity to avoid them. Because the effort was not made, the ship's officers were left in ignorance, unconscious of the fact that they were proceeding in the path of a West Indian hurricane of unprecedented violence. In this ignorance they brought their ship into shoal waters. As the immediate and proximate result, the vessel and her passengers suffered extraordinary damage. It is not enough to say that their seamanship was faultless with the information at hand, when they themselves had failed to make the simple inquiry which would have disclosed the imperative necessity of avoiding the course they took. It is plainly the duty of a vessel approaching our shores, and engaged in the

carriage of passengers, to make inquiry for full information regarding the state of the weather, if such information is not received without inquiry from the many stations which are established to transmit such information by wireless. The officers in charge of the navigation of the Arabic seem to have been entirely indifferent to the fact that the daily bulletins regarding the state of the weather, which were broadcasted from Arlington Station, were not communicated to them, and it was this indifference which left them in ignorance of the dangers they were running into. Conclusion inevitably follows that they did not exercise due care for the safety of their passengers.

Result is that the vessel and her owner are liable to the claimants for proximate damages resulting from the extraordinary seas which the vessel encountered in the course of the storm. The right to limit liability having been conceded, a decree in the usual form, granting limitation and denying exoneration of liability, may be entered, with provision for the taking of proofs before a commissioner of all claims which have been filed pursuant to the monition.

The question of the legal effect of clauses limiting the carrier's liability contained in tickets issued to passengers, and all other questions affecting the validity of individual claims, are reserved for consideration upon proof of claims before the commissioner, subject, of course, to review upon exceptions to his report. See rule 52, Admiralty Rules of Practice, Promulgated by the Supreme Court, and La Bourgogne (D. C.) 106 F. 232.