Complaint of **COMPAGNIE GENERALE TRANSATLANTIQUE, Plaintiff, as owner of the S. S. ANTILLES.**

**Civ. No. 914–71.**

United States District Court,
D. Puerto Rico.

April 17, 1975.

---

Vicente M. Ydrach, Hartzell, Ydrach, Mellado, Santiago, Perez & Novas, Hato Rey, P. R., for petitioner.

Jose Antonio Fuste, Jiminez & Fuste, San Juan, P. R., for claimants.

## OPINION

BEEKS,* District Judge:

This case arises from the grounding of the French passenger liner ANTILLES on an uncharted reef in the Grenadine Islands of the Caribbean Sea. The grounding occurred at 1621 hours on January 8, 1971 as ANTILLES was attempting a westerly passage of the channel that is bounded by the Island of Mustique to the South, and the group of rocks known as The Pillories, to the North.

As a result of the casualty, the owner and operator of ANTILLES, Compagnie Generale Transatlantique ("Owner"), filed a petition for limitation of or exoneration from liability in the United States District Court for the Southern District of New York. A number of claimants duly entered the limitation proceeding, and moved the New York Court to transfer the case to the District of Puerto Rico pursuant to Rule

---

* The Honorable William T. Beeks, Senior United States District Judge for the Western District of Washington, sitting by designation.

F(9), Supplemental Rules, Fed.R.Civ.P. and 28 U.S.C. § 1404(a). Subsequent to the transfer of the action to the District of Puerto Rico, several claimants filed direct action suits against Owner and its insurers.[1] These suits have been stayed pending the outcome of this proceeding.[2] The parties stipulated in advance of trial that the total of all claims filed against Owner would not exceed the amount of Owner's liability if limitation were granted:[3] limitation of liability, therefore, is no longer an issue of the case. It has been further stipulated that determination of the amount of damages, if necessary, is to be submitted to a special master. The sole issue now before the Court is whether Owner is entitled to exoneration from liability for damages arising out of the grounding of ANTILLES.

Grandly conceived and luxuriously appointed, ANTILLES was a vessel of imposing proportions. Having a length of 568 feet, a beam of 80 feet and a displacement of 20,263 tons, ANTILLES was one of the largest passenger vessels of the French merchant fleet. Although her port of registry was L'Havre, ANTILLES was employed during the winter months in the Caribbean cruise trade. The months of November, December and January found ANTILLES touring the Caribbean on cruises of one week to eleven days duration. During the 1970–1971 winter season, ANTILLES regularly visited Puerto Rico, Curacao, Venezuela, Barbados, Martinique, Guadeloupe, Antigua and St. Thomas.

The Caribbean winter cruise trade is highly competitive and vessels of many flags compete for tourist patronage. The various steamship companies seek to maximize their shares of the market by striving to provide the most elegant vessels, comfortable accommodations, sumptuous cuisine and varied recreation. The companies also endeavor to make their itineraries as interesting as possible, visiting the most exotic and beautiful areas accessible within the constraints of time and distance.

It is apparent from the record, and indeed is not contested, that the policy of Owner was to allow the masters of its vessels latitude to deviate from accustomed courses to take their vessels nearer to islands of unusual beauty or special interest. This was done to provide passengers the opportunity to see places not ordinarily visited by cruise ships, and to distinguish the cruises of Owner's vessels from those of competing steamship lines. It was in the course of such a deviation that ANTILLES met with disaster.

ANTILLES began her final cruise on January 5, 1971, departing San Juan, Puerto Rico, bound for Willemstad, Curacao, Neth. W. I. The vessel arrived at Willemstad, off the coast of Venezuela, on January 6. In the early morning of January 7 she was again underway, en route to La Guaira, Venezuela, where she arrived at 0700 hours.

By the evening of January 7 ANTILLES had departed La Guaira and was bound for Bridgetown, Barbados. This leg of ANTILLES' voyage put her

1. The various claims or complaints filed against Owner and West of England Steamship Owners Protection and Indemnity Association are cases numbered 387–71, 468–71, 481–71, 605–71, 910–71, 321–72. These actions were brought in the United States District Court for the District of Puerto Rico pursuant to a Puerto Rican statute authorizing direct suits against insurers. 26 L.P. R.A. §§ 2001–2003.

2. Order signed January 9, 1975.

3. This stipulation was entered into at a pretrial conference conducted by the Court on January 8, 1975. The limitation fund, consisting of strippings and passage money, is $101,150.00. Under 46 U.S.C. § 183(b), the gross tonnage of ANTILLES, 19,828 tons, is multiplied by $60.00 to determine the amount below which Owner's liability for personal injury claims may not be reduced in the event of limitation: to-wit, $1,189,680.-00. Under the stipulation, therefore, Owner's maximum exposure is $1,189,680.00 plus that portion of the $101,150.00 that is allocable to property claims.

on a generally northeasterly heading through the group of islands known as the Grenadines. Her projected course, plotted on a French chart of the Grenadines [4] was to take her, on the afternoon of January 8, along the eastern coast of Mustique Island, and then northwesterly past the western shore of the Island of Baliceaux. This projected course would have put ANTILLES one mile east of Mustique as she traveled along the coast of that island.

However, on the morning of January 8 the master of ANTILLES, Captain Kerverdo, decided upon a different course, one that would take ANTILLES closer along the eastern shore of Mustique, and then westerly through the passage north of Mustique and south of The Pillories. The testimony and exhibits reflect that Mustique is an island of great natural beauty: Captain Kerverdo's decision to alter course was undertaken to provide ANTILLES' passengers a better look at this enchanting isle, and was consistent with the Captain's desire to implement Owner's policy of making ANTILLES' cruises entertaining and unique.

The passage between Mustique and The Pillories is limited by Single Rock on the North, and by Double Rock on the South. The expanse of open water between Single and Double Rocks is about 700 yards. Soundings shown on the French chart used by ANTILLES indicate depths of thirteen and sixteen meters, respectively, to the east and west of the channel between Single and Double Rocks.[5] ANTILLES' maximum draft was 8.0 meters.[6]

At 1621 hours, as ANTILLES was proceeding through the passage at a speed of sixteen knots, she grounded amidships, broke in two, and caught fire. The wreck of ANTILLES now marks the position of a theretofore uncharted reef that lies between Single and Double Rocks.

Claimants, passengers on the final voyage of ANTILLES, seek to recover on personal injury and property claims arising out of the grounding of the vessel.[7] They assert that ANTILLES was unseaworthy at the time of her stranding, and that the stranding was the result of unseaworthiness and of negligence on the part of the vessel's officers and crew.

■ Although claimants couch their allegations in terms of both negligence and unseaworthiness, Owner can be liable only upon a finding of negligence. The warranty of seaworthiness and the absolute liability that attaches to the breach thereof is applicable only to seamen: There is no implied warranty of seaworthiness extended to passengers.[8] Nonetheless, any failure to provide a seaworthy vessel might properly be considered in a determination of whether

4. Petitioner's Exhibit 8.

5. The French chart shows a sounding of 16 meters approximately ³/₂₀ths of a mile northwesterly of the point at which ANTILLES grounded, and a sounding of 13 meters approximately ³/₂₀ths of a mile northeasterly of the same point.

6. At the commencement of her voyage, ANTILLES drew 6.63 meters forward, and 8.17 meters aft. At the time of her grounding ANTILLES' draft had been reduced because of fuel consumption, but the reduction was negligible.

7. Owner sought to enforce, by way of a motion to dismiss, alleged exculpatory contractual provisions contained in its passenger tickets. These provisions purported to impose a four month limitation period within which to file property claims, and a limitation as to the maximum allowable amount of such claims. In an order dated January 13, 1975, the Court denied the motion, ruling that the virtually illegible clauses were insufficient to apprise a ticket purchaser that his rights were subject to limitation, and that the clauses did not contractually bind purchasers.

8. Isham v. Pacific Far East Line, Inc., 476 F.2d 835, 836 (9th Cir. 1973); Tullis v. Fidelity & Casualty Co. of New York, 397 F. 2d 22 (5th Cir. 1968); The Oregon, 133 F. 609, 617 (9th Cir. 1904); The Nellie B., 174 F.Supp. 846, 858 (S.D.Tex.1959); Gardner v. Panama Canal Co., 115 F.Supp. 687, 691 (D.Canal Zone 1953); 3 Benedict on Admiralty § 488, p. 375 (6th ed. 1940); Robinson on Admiralty § 78, p. 553 (1939).

Owner has conformed to the standard of care owed to passengers.

■ A carrier is bound to exercise the highest degree of care and dilligence in providing for the safety of its passengers.[9] Claimants first allege that Owner breached this duty by failing to provide a seaworthy vessel. Allegations of the unseaworthiness of ANTILLES relate to the operational status of electronic navigational equipment aboard the vessel, and to the use of certain charts, the adequacy of which is called into question.

The evidence adduced offers no support for those claims of unseaworthiness based upon alleged inoperability of ANTILLES' electronic navigational equipment, and such claims are not pursued in claimants' post-trial brief. I find these claims to be without merit.

Claimants' post-trial brief emphasizes ANTILLES' use of the French chart of the Grenadines as the basis for a finding of unseaworthiness. Claimants assert that a chart of the same area published by the United States Naval Oceanographic Office is a superior chart in that it is based upon a more recent survey, shows soundings at more frequent intervals, and delineates the ten fathom curve around shoal waters.

The testimony of Captain Kerverdo indicates that regulations promulgated by Owner required him to use the French chart for navigating ANTILLES, and that he was, in fact, using the French chart at the time of the grounding. Captain Kerverdo also testified that a copy of the American chart was kept on the bridge for reference.[10]

■ The degree to which the charts in question might properly be relied upon will be discussed more fully below: the present question is whether the charts provided ANTILLES by Owner were so inadequate for their intended use as to render the vessel unseaworthy.

The French chart upon which ANTILLES' officers plotted the vessel's course was first published in 1875 by the Service Hydrographique de la Marine, and is based on a survey taken in 1861. The American chart, kept on the bridge for reference, is based upon a British survey undertaken in 1891. Both charts are on a scale of 1:72,560. Soundings on the French chart are in meters; those on the American chart are in fathoms. The French chart depicts the ten meter curve around shoal waters while the American chart shows the ten and five fathom curves. It is alleged by claimants that the American chart reveals soundings taken at closer intervals, and would more readily alert a navigator to the presence of certain navigational hazards.

The French chart was kept current in accordance with weekly notices in Avis Aux Navigateurs, published by the Service Hydrographique. The chart used by ANTILLES, a 1959 edition, reflected all changes reported by Avis Aux Navigateurs: it was current through the date of the accident. Notice to Mariners, the United States Naval Oceanographic Office publication by which American

9. Liverpool and Great Western Steam Co. v. Phenix Ins. Co., 129 U.S. 397, 440, 9 S.Ct. 469, 32 L.Ed. 788 (1889). Other courts have used various language in imposing similarly high standards: Pennsylvania Co. v. Roy, 102 U.S. 451, 456, 26 L.Ed. 141 (1880), Stokes v. Saltonstall, 13 Pet. 181, 38 U.S. 181, 191, 10 L.Ed. 115 (1839) (duty to transport passengers safely, "[as] far as human care and foresight can go"); Allen v. Matson Navigation Company, 255 F.2d 273, 277 (9th Cir. 1958) ("extraordinary vigilance and the highest skill"); Moore v. American Scantic Line, 121 F.2d 767, 768 (2nd Cir. 1941) ("as much skill, care, and prudence as an exceedingly competent and cautious man would bring to the task in like circumstances"); Kitsap County Transp. Co. v. Harvey, 15 F.2d 166, 167 (9th Cir. 1926) ("high degree of care"); Gardner v. Panama Canal Co., id., 115 F.Supp. at 691 (quoting Robinson, id. at 553: "very high degree of care, prudence and foresight"); The Arabic, 34 F.2d 559, 562 (S.D.N.Y.1929) ("highest degree of care").

10. U. S. Naval Oceanographic Office, Carriacou to Bequia, (H.O. 1640, 12th ed. 1922, revised, May 5, 1969) [petitioner's Exhibit 10].

charts are kept current, carried a report in 1970 of a reef being extended beyond its charted position on the southwest coast of Mustique. Neither chart carried by ANTILLES reflected this change. The Avis Aux Navigateurs carried no equivalent notice, and ANTILLES did not receive Notice to Mariners. The reef reported extended in 1970 southwest of Mustique was not involved in the demise of ANTILLES.

The testimony in this case does not indicate that there were available to ANTILLES any charts of the area surrounding Mustique that were more accurate than the French and American charts she carried on her bridge. Although based upon surveys undertaken many years ago, both charts were recent editions, and the French chart actually used in navigation was kept current through the date of the grounding. Any chart used in navigation has inherent limitations and must be relied upon only with due caution. Nonetheless, claimants have not sustained their burden of proving that the charts carried and employed by ANTILLES were so inadequate for their intended purpose as to render the vessel unseaworthy, and I find that they were not.

A related question is whether the policy of Owner that required ANTILLES to utilize the French chart for purposes of navigation was negligent in light of the alleged superiority of the American chart. The only differences between the two charts that have been raised are the alleged greater frequency of the soundings on the American chart, the presence on the American chart of the ten fathom curve (as opposed to the ten meter curve shown on the French chart), and the alleged superiority of the graphics of the American chart as relates to the ability of the chart to alert a navigator to potential danger.

With regard to the frequency of the soundings, the Court finds that although the American chart does indeed show soundings taken at more frequent intervals, the difference is not sufficient to demonstrate any significant superiority of the American chart. In many areas shown by both charts the American chart will show many identical soundings, whereas the French chart will show the uniform soundings more sparsely. Nonetheless, the French chart will reflect aberrant soundings as accurately as the American. Insofar as the frequency of the soundings is a factor, the French chart is as suitable as the American.

Claimants place great emphasis on the fact that the American chart depicts the ten fathom curve around shoal waters. Captain Melo testified as an expert on navigation that the ten fathom curve is valuable as a general guide to those waters into which a large vessel should not venture under ordinary circumstances. However, in this case the ten fathom depth was not critical to ANTILLES: Given the decision to attempt the relatively shallow passage, the ten meter curve depicted on the French chart bore a closer relationship to ANTILLES' own eight meter draft. Moreover, the entire passage between Mustique and The Pilories is obviously under ten fathoms in depth, and lies wholly within the ten fathom curve on the American chart. Whatever the wisdom of Captain Kerverdo's decision to undertake the passage, the decision was not made in ignorance of the fact that the passage would take ANTILLES through waters of under ten fathoms charted depth.

Claimants also allege that certain graphic features of the American chart are superior to those of the French chart in that they indicate with greater emphasis areas of hazardous navigation. Claimants specifically point to the broken line on the American chart that indicates the five fathom curve, and the fact that this line is open in the vicinity of the passage in which ANTILLES grounded. The court accepts as true claimants' contention that this open line at least suggests that the shoal water lying north of Mustique in and around Sandy Bay might extend north of Dou-

ble Rock and into the area that the French chart depicts as the somewhat deeper passage attempted by ANTILLES. It might therefore be said that although both charts show similar soundings within the passage, the American chart does offer a greater suggestion of possible hazard in the area of Double Rock. The suggestion of hazardous water is heightened by the American chart's inclusion of the caption "Sandy Bay," the caption extending on the American chart well into the passage between Mustique and The Pillories. Sandy Bay is described in *Sailing Directions for the West Indies* [11] (published by the United States Naval Oceanographic Office and carried by ANTILLES) as "shallow and foul."

These differences between the two charts lead me to conclude that the American chart offers greater indications of danger in the area north of Mustique. However, the difference between the two charts is slight. It must be remembered that neither chart clearly indicates shoal water in the passage, and such soundings as are printed on both charts show depths in excess of ANTILLES' draft. Further, ANTILLES did carry both charts on her bridge, and although courses were plotted on the French chart only, Captain Kerverdo did in fact refer to the American chart before undertaking the passage.

I am unable to conclude that ANTILLES was unseaworthy by virtue of Owner's rule that required use of French charts in navigation.[12] Whatever subtle advantages might have been offered by the American chart were in fact available to ANTILLES' officers on the bridge. The use of one chart rather than the other for the actual plotting of courses, when the information offered

by both is available, does not render the vessel unseaworthy; neither is it negligent. There is thus no showing of unseaworthiness or negligence related to the charts carried aboard ANTILLES or rules regarding the use to be made thereof.

It is claimants' further contention that the stranding of ANTILLES occurred as a result of the negligent navigation of the vessel. They assert that the decision to navigate ANTILLES through the passage north of Mustique was imprudent, and manifests a breach of the high standard of care owed by Owner to its passengers. Owner contends that ANTILLES was properly navigated, that grounding of the vessel on an uncharted reef was unforeseeable, and not attributable to any fault on the part of its employees, the officers of ANTILLES.

■ A mistake in judgment in handling a vessel, viewed from the vantage point afforded by hindsight, is not to be imputed as fault.[13] Rather, the inquiry must focus on whether, under the circumstances then existing, the decision to take ANTILLES through the passage north of Mustique was one as might properly have been made by a prudent navigator charged with the highest standard of diligence and skill in the care of the safety of his passengers.

There are several methods of navigation used under different circumstances. These include dead reckoning, electronic navigation, celestial navigation and piloting. At the time leading up to her stranding, ANTILLES was being piloted through the waters around Mustique. As defined by the United States Navy Hydrographic Office publication, *American Practical Navigator*,[14] piloting is

11. *U.S. Naval Oceanographic Office, Sailing Directions for the West Indies*, Vol. II, Lesser Antilles and Venezuela, p. 169 (H.O. Pub. 22, 7th ed., change 5, 1963).

12. *See, Complaint of Compania Naviera Epsilon, S.A.*, 1974 A.M.C. 2608 at 2613.

13. In re Harris, 216 F.Supp. 176 (E.D.La. 1963), reversed, Walker v. Harris, 335 F.2d

185 (5th Cir.), cert. denied, 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342 (1964).

14. *U.S. Navy Hydrographic Office, Bowditch, American Practical Navigator*, Ch. II, p. 62 (H.O.Pub. 9, 1962 Corrected Reprint). *American Practical Navigator* is published, as are H.O. 1640 (*supra* note 10) and *Sailing Directions* (*supra* note 11), pursuant to

". . . navigation involving frequent or continuous determination of position or a line of position relative to geographic points, to a high order of accuracy. It is practiced in the vicinity of land, dangers, aids to navigation, etc., and requires good judgment and almost constant attention and alertness on the part of the navigator."

Piloting thus involves the use of navigational instruments to determine the position of the ship relative to visible objects such as land formations and aids to navigation, and the transfer of this information to a chart, thereby pinpointing the position of the vessel thereon. The information provided by the chart itself, such as the distance and relative bearings of different points, and the depth of surrounding water, is then utilized to determine the proper course on which to proceed. The accuracy of the chart itself is thus critical to safe piloting. In the present case the chart was inaccurate: it failed to indicate the existence of the reef upon which ANTILLES grounded. It must therefore be questioned whether the officers of

ANTILLES were entitled to rely upon the accuracy of the chart in piloting the vessel in and around the Island of Mustique.

It must first be observed that the French chart used in navigation and the American chart used for reference were both of rather ancient vintage, being based upon surveys taken in 1861 and 1891, respectively. Whereas modern surveys are conducted with the benefit of electronic equipment that can accurately scan large areas of the ocean floor, surveys conducted in the Nineteenth Century relied upon use of the leadline. The leadline is a device consisting, simply, of a lead weight secured to the end of a line. The lead is lowered until it hits bottom, at which point markers on the line are read to determine the depth of the water. Rather than a scan of the bottom, the leadline method reveals the depth at single points along the ocean floor. Soundings taken by this method from a craft moving along the surface appear on a chart as a line of soundings. The distance between individual soundings along the line, and between the lines themselves

10 U.S.C. §§ 7391, 7392. Section 7391 provides that:

"There is attached to the Office of the Chief of Naval Operations a United States Naval Oceanographic Office. The United States Naval Oceanographic Office shall improve means of navigating vessels of the Navy and merchant marine by providing, under the authority of the Secretary of the Navy, accurate and inexpensive nautical charts, sailing directions, books on navigation, and manuals of instructions for the use of all vessels of the United States and of navigators generally."

The United States Naval Oceanographic Office is the successor of the United States Navy Hydrographic Office. 10 U.S.C. § 7391 (1956), as amended, 10 U.S.C. § 7391 (1962). Oceanographic Office publications continue to carry the "H.O." (Hydrographic Office) prefix.

The Court takes judicial notice of *American Practical Navigator* as a standard reference text on the subject of navigation, see, Owens-Illinois Glass Co. v. American Coastal Lines, Inc., 222 F.Supp. 923, 927 (S.D.N.Y. 1963), and as an official government publication issued pursuant to an act of Congress.

10 U.S.C. § 7391. In The Eleanor, 248 F. 472, 474 (6th Cir. 1918), the court observed that:

". . . it is well settled that much latitude is allowed courts of admiralty in dealing with facts relating to navigation. Not only may the court itself take judicial notice of many things of which the common-law courts would require proof, but it is not bound by all the rules of evidence applied in courts of common law."

The court in The Eleanor upheld the trial court's reliance on its own knowledge and experience in seamanship and navigation in evaluating conflicting evidence. Similarly, it is proper for this Court to take judicial notice and draw upon the expertise of a government office established by Congress for the purpose of furthering competent navigation. *See also*, Westchester Fire Ins. Co. v. Buffalo Housewrecking & Salvage Co., 40 F.Supp. 378 (W.D.N.Y.1941); 3 Benedict on Admiralty, *supra* note 8, § 381b, p. 5. The information and perspective provided by *American Practical Navigator* confirms the conclusion that 1 would independently reach the basis on the evidence before me.

can vary. There is thus the possibility that some aberrant features of the ocean floor may lie between points actually sounded, and consequently not be reflected on the chart prepared from the survey.[15] *American Practical Navigator* offers the following admonition: "If the chart is based upon very old surveys, it should be used with caution. Many of the earlier surveys were made under conditions that were not conducive to great accuracy. It is safest to question every chart based upon surveys of doubtful accuracy."[16]

For the blue water navigator, a certain degree of inaccuracy in the soundings does not pose a significant danger. For a pilot, however, seeking to navigate a large vessel through a narrow and shallow passage that is surrounded by shoal water and rocks, any inaccuracy in the soundings can prove disastrous. When a chart that is based upon an old survey is to be used in piloting a vessel through such a passage of uneven and limited depth, the suspicion with which such charts should be treated must be increased.

There are additional factors present here that should have alerted the officers of ANTILLES to the potential danger of navigating the passage north of Mustique. First, the American chart shows the interrupted five fathom curve in the area of Sandy Bay and Double Rock. The soundings in the area of the broken curve indicate depths of one, two, three, five and eight fathoms. Sandy Bay is known to be "shallow and foul." [17] *American Practical Navigator* suggests that

". . . [the] absence of depth curves, generally indicate[s] lack of soundings in the area. If the water surrounding such a blank area is deep, there is generally considerable depth in the blank; conversely, shallow water surrounding such an area indicates the strong possibility of shoal water. If neighboring areas abound in rocks or are particularly uneven, the blank area should be regarded with additional suspicion." [18]

Further, Mustique and the Grenadines in general lie in an area of extensive coral formation.[19] Mr. Money-Coutts, a man of extensive seagoing experience who spent several years on Mustique testified to this fact, as did Captain Melo. Mr. Money-Coutts in fact testified that coral reefs surround Mustique, that he has dived in such formations, that he has observed the coral reefs in the passage north of Mustique, and that

---

15. This danger becomes more apparent when considered in light of the distortion inherent in a printed sounding on a large scale chart. For example, the figure "13" that appears on the French chart approximately ¼ mile northeast of Double Rock, indicating a sounding of 13 meters, itself covers 1/10 of a nautical mile on the chart. Thus, a single leadline sounding that surveyed, at best, several inches of the ocean floor, is reflected on the chart to indicate the depth of water in an area 1/10 mile wide.

16. *American Practical Navigator, supra* note 14, Ch. IV, pp. 104–105.

17. *Sailing Directions, supra* note 11.

18. *American Practical Navigator, supra* note 14, Ch. IV, p. 105.

19. *Sailing Directions, supra* note 11 at 169 describes the features surrounding Mustique as follows:

"MUSTIQUE (12°52' N., 61°11' W.), an island, rises to 495 feet high in its southern part. Double Rock, 20 feet high, lies about ¼ mile northward of Mustique.

"Sandy Bay, shallow and foul, indents the northern side of the island. The eastern side of the island is bordered by a reef which extends up to ¼ mile offshore and on the southern end of which lie Rabbit Islet and Double Rock. Brooks Rock, 60 feet high, which has breakers close northeastward of it, lies about 600 yards eastward of Mustique. A rock, with a depth of 9 feet on which the sea breaks, lies about ½ mile eastward of the southern end of the island.

"Reefs fringe the western side of Mustique in many places. Montezuma Shoal, with a depth of 3 feet, lies about 800 yards off the western side of the island. This shoal is extremely dangerous as it does not break with a smooth sea and cannot be seen in time to avoid it."

the reef upon which ANTILLES grounded is visible from the surface, lying at a depth of only ten or twelve feet in the passage. The prevalence of coral reefs in the area surrounding Mustique is a factor demanding increased caution in the use of a chart of the area based upon a survey over one hundred years old. The presence of coral formations increases the likelihood that the spaces between charted soundings might contain dangerous shoals. Soundings in the passage north of Mustique were spaced on the French chart as widely as three-tenths of a mile apart, and two-tenths of a mile apart on the American chart.

There was available to the Captain of ANTILLES a further subtle warning about the danger of the passage. In the description of Mustique in the *Sailing Directions* [20] it is noted that "[t]he passage between Petit Coy and Mustique has charted depths of 7 to 9 fathoms in the fairway," and that the passage between Single Rock and The Pillories has "a depth of 3½ fathoms . . . In the fairway." There is no corresponding statement about the passage between Mustique and The Pillories. Captain Melo testified that an inference might be drawn that the navigability of the passage between Mustique and Petit Coy has been ascertained, whereas the navigability of the passage between Mustique and The Pillories has not.

The facts reveal, therefore, that ANTILLES was being navigated by use of charts of suspect reliability. The dates of the surveys of both charts, the broken five fathom curve on the American chart, the *Sailing Directions'* description of Sandy Bay, and of the passages and reefs appurtenant to Mustique, the unmistakable presence of rocks and the possible presence of coral formations in the area of the passage north of Mustique all combine to have put the master of ANTILLES on notice of the potential existence of hazards to navigation in the passage. The potential danger of inaccuracies in the charts is heightened in this case by the very small margin for error indicated even by the charted depths. The narrow passage, allowing for very limited maneuverability, had charted depths indicating that ANTILLES would at times have less than five meters of water between her keel and the bottom. In other words, the charts would not have to be grossly inaccurate to cause disaster: even the minor inaccuracies made likely by the age of the survey and the nature of the surrounding waters would be sufficient to put ANTILLES aground. Accordingly, I must find that ANTILLES was not entitled to the luxury of implicit reliance on the accuracy of her charts.

This is not to say that there are no circumstances under which a vessel of ANTILLES' size could non-negligently navigate a narrow passage in restricted waters. Where, as here, however, there is notice to the navigator of the potential danger of reliance on the charts, prudence dictates that some precautions be taken to verify the navigability of the channel. Without intimating a view as to what precautions might be necessary or sufficient, it is suggested that there were several measures that might have been taken by ANTILLES to ascertain the safety of the passage. First, ANTILLES might have taken a pilot aboard, one familiar with local waters. Captain Melo testified that it would have been prudent to do so. If no pilot was available, inquiry might have been made of the British Government's representative on Mustique, or of any other person having knowledge of local waters, as to the navigability of the passage. Or, in advance of the voyage, Owner might have chartered an aircraft to inspect any waters of questionable navigability it was contemplated that Owner's vessel might encounter.[21] Alternatively,

---

20. *Id.* at 169.

21. Captain Melo testified that the reef upon which ANTILLES grounded is visible from

the air. Mr. Money-Coutts testified that coral formations throughout the area of Mustique are visible from the air.

ANTILLES might have anchored outside the channel and sent a small craft ahead with a leadline to sound the passage and ascertain the depth of water therein. If none of these safety precautions or others were feasible at the time, prudence required that ANTILLES forego the opportunity to reveal to its passengers the magic of Mustique as witnessed from the north passage.

■ It is the duty of the navigator to obtain all information necessary to proper management of the vessel.[22] Having only charts of suspect accuracy, it was the duty of the officers of ANTILLES to obtain additional information about the safety of the proposed course before attempting the passage. In light of the duty of Owner and its employees to exercise the highest degree of care and skill in providing for the safety of passengers, I am compelled to find that the navigation of the passage north of Mustique, undertaken in complete reliance on the charts, was imprudent and negligent. I am convinced by the testimony of Captain Melo that a prudent navigator would not have attempted that passage with a vessel the size of ANTILLES.

Captain Kerverdo and his fellow officers of ANTILLES who testified at trial are to be commended for their candor and demeanor. It is my belief that the Captain is an experienced and competent master whose fault herein lies in the enthusiasm and lack of circumspection with which he tried to implement the policy of Owner to navigate ANTILLES close ashore whenever possible to provide the vessel's passengers a unique opportunity to experience the beauty of the Caribbean. Nonetheless, the desire to provide a more enjoyable cruise cannot override the duty to exercise great vigilance to insure the safety of the voyage.

Accordingly, I find that the grounding of ANTILLES was the result of negligent navigation of the vessel, and Owner is therefore liable to claimants for damages arising therefrom. Liability having been found, the case is to be submitted to a special master for determination of the amount of damages.

The foregoing shall constitute my findings of fact and conclusions of law on the issue of liability in accordance with Fed.R.Civ.P. 52(a). Counsel for claimants is directed to prepare an Interlocutory Decree in accordance herewith.

22. The Havana, 45 F.Supp. 244 (S.D.N.Y.1942).