Petition of NEW ENGLAND FISH COMPANY, a corporation, owner of the Fishing Vessel DEEP SEA, for exoneration from or limitation of liability.

No. 76–682B.

United States District Court,
W. D. Washington.

Feb. 1, 1979.

Motion for Reconsideration Denied
Feb. 27, 1979.

Robert V. Holland, of Bogle & Gates, Seattle, Wash., for petitioner, New England Fish Co.

Douglas M. Fryer, of Moriarty, Long, Mikkelborg & Broz, Seattle, Wash., for claimants Nichols and Eldridge.

Douglas D. McBroom, of Schroeter, Goldmark & Bender, Seattle, Wash., for claimants McCrea.

James S. Rogers, of Franco, Asia, Bensussen, Coe & Finegold, Seattle, Wash., for claimant Rodgers.

Gale P. Hilyer, Jr., Seattle, Wash., for claimant McKee.

OPINION

BEEKS, Senior District Judge.

On August 26, 1976, at approximately 0415 hours[1] the O/S DEEP SEA sank in the vicinity of Whale Passage near the town of Kodiak, Alaska. All eight persons aboard were lost including her crew of three, John Nichols, master; Bernard Eldridge, engineer; Earl McKee, cook/deckhand; and five passengers, Valerie McCrea, Kathy McCrea, Molly McCrea, Heather McCrea, and Cy Michael Rodgers. The vessel owner, New England Fish Company (Nefco) has instituted this action for exoneration from or limitation of liability pursuant to 46 U.S.C. § 183, *et seq.* asserting that the loss of the vessel was due to force majeure. The action on behalf of the survivors of the deceased passengers is based upon negligence and unseaworthiness, while that of the survivors of the crew is based solely upon unseaworthiness.

The DEEP SEA was a single screw fish tender of wood construction built in 1945. She was 80 feet in length (72.5 feet between perpendiculars), with a beam of 19.2 feet, a depth of 9.6 feet, and a draft of 8.0 feet. She was of 96 gross and 71 net tons and was propelled by a six cylinder Atlas Imperial engine rated at 250 h.p., giving her a cruising speed of 9.5 knots.

She had been operating out of Nefco's Uganik Cannery (located on the west side of Kodiak Island) since 1946 as a dry tender. Ordinarily she would leave the cannery every day to pick up fish from independent fishermen. In the evening she would return to the cannery and unload her cargo. The vessel operated without ice approximately 95% of the time. During the regular fishing season of 1976 she was manned by a crew of four: master, mate, engineer and cook/deckhand.

On August 18, 1976 Nefco closed the Uganik Cannery for the season and all of its tenders except DEEP SEA and BOXER were sent elsewhere. Shortly thereafter the fishing season was reopened for a period of 5 days. Ivan Fox, superintendent of

---

1. All time herein is based on Alaska Daylight Saving Time.

the cannery, dispatched DEEP SEA to Packer's Spit on August 22, 1976 to service fishermen in the vicinity, primarily beach seiners and set netters, during the special season opening. The fish taken aboard consisted primarily of pink salmon, the most perishable of the salmon species. Unless iced or refrigerated, pinks must be processed within 24 hours to prevent spoiling. Because Uganik had been closed DEEP SEA was unable to unload daily, making it necessary to ice the fish which Fox intended to have processed in the town of Kodiak on the eastern side of the island.

During the hours of darkness on August 24/25 DEEP SEA returned to the cannery from Packer's Spit to refuel and take on additional ice. Fox observed the vessel at the fuel dock on the morning of August 25 where she had been moored during the previous night. At about 1300 that afternoon Fox talked with Nichols while DEEP SEA was icing and told him DEEP SEA was expected at the Kodiak cannery at 0800 the next morning. The vessel then departed Uganik for the last time between 1300 and 1330.

Upon departure she carried a crew of 3: John Nichols, master; Bernard Eldridge, engineer, and Earl McKee, cook/deckhand. The vessel arrived at Packer's Spit approximately one hour later and loaded fish from 1700 to approximately 2100. Prior to departing, DEEP SEA boarded the forenamed passengers who were family members of beach fishermen. The vessel then battened down and proceeded to Kodiak, a trip of approximately 7.5 hours. Fox called DEEP SEA at 2200, in accordance with his usual schedule, and Nichols informed him that they were battening down and he would call Fox at 2300 when he was less busy. However, the last word from DEEP SEA was a distress signal sent out at 0415, August 26, 1976, by an unidentified person: "Mayday, Mayday, vessel DEEP SEA, vicinity Whale Pass." The vessel and all aboard were lost.

The question of liability hinges on the cause of the loss. No one survived and only scattered wreckage was recovered. Thus, claimants' burden is great. They must piece together the loss of DEEP SEA without the aid of any direct physical evidence or eyewitness accounts. The law, however, provides claimants faced with such an onerous burden some relief. Where claimants establish negligence or unseaworthiness on the one hand and there is an unexplained loss of a vessel in expectable weather on the other, the court is permitted, although not required, to infer that the unseaworthiness or negligence was the proximate cause of the loss.[2] Claimants' burden is, therefore, reduced to establishing negligence or unseaworthiness which reasonably, though not necessarily, may have been the cause of the loss.

Claimants first contend that DEEP SEA was unseaworthy in that she was equipped with bin boards inadequate in both size and number which allowed the cargo to shift causing the vessel to capsize. Claimants have failed to establish this contention.

Next, it is asserted that the vessel was negligently manned. It is uncontroverted that the vessel was carrying only 3 instead of 4 crewmen and that the cook/deckhand was totally inexperienced. McKee joined the crew at the request of Nichols approved by Fox. The crew usually included a mate, although none was carried on the fatal voyage. An experienced mate was not available and none was employed by Fox after Nichols informed him that he thought a mate was unnecessary for the short trip to Kodiak. Events were to prove both Nichols and Fox tragically in error. I find that their negligence resulted in an undermanned and incompetent crew. In effect, DEEP SEA carried only two crewmen; McKee had no knowledge of seamanship; he was employed by Nefco as a machinist in the reform shop where tin plate cans are shaped before canning. The vessel

---

2. *Admiral Towing v. Woolen,* 290 F.2d 641, 652 (9th Cir. 1961); *In re MARINE SULPHUR QUEEN,* 460 F.2d 89 (2nd Cir. 1972).

was undermanned and was, thus, unseaworthy.[3]

■ The vessel was also unseaworthy in that she was incompetently crewed. The long hours of continuous duty required of the crew under the conditions existing at the time in question must have affected their performance and judgment. This is especially true of the master, the only experienced navigator on the vessel. At the time DEEP SEA sank Nichols had been on duty for approximately 15 hours. The vessel left Uganik at about 1300 and arrived at Packer's Spit an hour later. She began loading fish at 1700 and departed for Kodiak between 2100 and 2200. All of these duties required the attention of the master. When DEEP SEA was anchored taking on fish Nichols had to supervise the operation and issue fish tickets to the fishermen. As the vessel prepared to depart for Kodiak, he had to make sure she was properly battened down. In fact, Nichols was so busy when Fox called at 2200, he said he would have to call back in an hour. At the time of this call the crew of DEEP SEA had already worked 9 hours and Kodiak was approximately 7.5 hours away from Packer's Spit. When the vessel was underway to Kodiak the master's presence in the wheelhouse was mandatory. He was the only one aboard competent to navigate the vessel, and if another crewman was at the wheel Nichols was certainly supervising him.

The voyage to Kodiak was to be made in inclement weather and through Whale Passage, which requires "careful attention to steering" even in the best of conditions, due to the various shoals and tricky currents.[4] I am satisfied that DEEP SEA exited the eastern entrance of Whale Passage at a time near full ebb tide which runs from west to east at approximately 6 knots. "Passage through Whale Passage at times of maximum current should be avoided . . . . During large tides, the currents are very strong with boils and swirls."[5] Mariners are to "exercise particular caution" at times of maximum current because "[f]loating aids to navigation may be dragged under or off station during these periods."[6]

DEEP SEA endeavored to make the passage during the height of a strong gale from the northeast with winds of 40 to 50 knots. With a strong ebb tide meeting gale force winds in an area subject to violent whirlpools and severe rips, confused seas of at least 15 to 20 feet from the eastern entrance of the Passage to ¼ mile east of Ilkognak Rock could be expected. Nichols tried to negotiate this area after he had been working for 15 hours without relief. Kodiak was only about 2 hours cruising time from Whale Passage and DEEP SEA could have sought shelter within Whale Passage itself to let the tide and storm abate before proceeding.[7] In fact one fishing vessel was observed by the Coast Guard rescue helicopter pilot riding out the storm very comfortably 1 mile south of Occident Point on Whale Island within the Passage at approximately 0730.

3. *Admiral Towing Co. v. Woolen, supra*, 290 F.2d at 646.

While underway during the hours of darkness, DEEP SEA was required to have a lookout who was a competent seaman. McKee was not. A lookout is to be a competent seaman who is stationed as far forward as possible with no other duties. *See generally*, R. Farwell, *The Rules of the Nautical Road*, 358 (rev. ed. 1954); J. Griffin, *The American Law of Collision*, §§ 106–7 (1949), and cases cited therein.

4. 9 United States Coast Pilot 89 (7th ed. 1964) [hereinafter cited as U.S.C.P.]. The Coast Pilot is a publication of the National Oceanic and Atmospheric Administration, U. S. Department of Commerce for the guidance of mariners.

The court may take judicial notice of publications of this type. *See, e. g., In the Matter of the Complaint of Compagnie Generale Transatlantique*, 392 F.Supp. 973 (D.P.R.1975), 1975 A.M.C. 1159.

5. 9 U.S.C.P. 89–90.

6. *Id.*, 9 U.S.C.P. Supplement, at 32 (January 1, 1976).

7. "A better anchorage can be had 0.3 to 0.4 miles off the western side of Whale Island, in 8 to 10 fathoms. This is convenient to either Whale Passage or Afognak Strait, and is well out of the current; the anchorage is exposed to westerly winds." 9 U.S.C.P. 89.

■ Although claimants are unable to directly establish that the negligent and unseaworthy manning of the vessel was a proximate cause of its loss, the evidence supports an inference of causation. The loss of the vessel was most immediately due to the master's negligence in deciding to use Whale Passage under conditions existing at the time of transit. While there was one other experienced crewman, the engineer, Nichols was the only experienced navigator and his physical and mental endurance must have been overtaxed by working long hours in such severe conditions with an undermanned and incompetent crew. The DEEP SEA was unseaworthy in such respects and the unseaworthiness contributed to his fatal mistake in judgment.

Petitioner maintains that the weather was the sole cause of the sinking. I am convinced that the weather was very severe but not catastrophic in the sense that it could not be expected. Severe weather is common in the Kodiak area. According to Fox, a vessel which cannot withstand 40 to 50 knot winds would not be usable as a tender, and seas of at least 14 feet must be anticipated.[8] Furthermore, the weather forecasts broadcast for August 25 and August 26, 1976 were for gale warnings in the vicinity of Kodiak Island. DEEP SEA was not set upon by a williwaw. The weather conditions were foreseeable and Petitioner's contention must be rejected. Thus, claimants have met their burden in establishing causation.[9] Accordingly, I find Petitioner liable for the loss of DEEP SEA.

All of the passengers are entitled to recover. They were taken aboard DEEP SEA with the approval of Captain Nichols in accordance with Nefco's usual and customary practice. Nefco competes for the catch of fishermen and it provides various services to them such as transporting families and supplies to and from the fishing grounds. Thus, the presence of the passengers aboard the vessel was not only authorized, but benefited Nefco.[10]

■ Of the crew, both Nichols and Eldridge are entitled to recover; McKee's claim has been compromised and settled. The claim of Eldridge is not barred although an election was made for benefits under the Workmen's Compensation Act of Alaska pursuant to Section 13 A. of the union contract. By its terms, an election under that section bars only claims under the Jones Act. It does not bar claims made under the general maritime law based on unseaworthiness.

■ The recovery for the death of Nichols, however, must be reduced. Nichols' own negligence in venturing into the teeth of a well known and treacherous hazard with an inadequate and incompetent crew contributed to his own demise. He consented to the absence of a mate and proposed the employment of McKee. Nichols' recovery is, therefore, reduced in proportion to his own culpability which I find to be 50 percent.

■ Having established liability, claimants now seek to deny Petitioner the benefit of the limitation statute. I find that the unseaworthiness of DEEP SEA which contributed to its loss was within the knowledge and privity of Nefco through the knowledge and actions of Fox. Although Nichols asked that McKee join the crew of the vessel and informed Fox that a mate would be unnecessary, it was Fox's responsibility, as plant superintendent of the Uganik Cannery, to see that the vessel was properly manned. By agreeing to Nichols' requests Fox evidenced great confidence in the judgment of the master of DEEP SEA (whose abilities were generally held in high esteem by those who knew him). The ac-

---

8. DEEP SEA was a staunch vessel built in the best shipbuilding practice. Captain Raynaud, who knew the vessel well, testified, and I find, that she could withstand 20 foot seas if properly handled.

9. See In re MARINE SULPHUR QUEEN, 460 F.2d 89, 99–100 (2d Cir. 1972).

10. Kermarec v. Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); Olsen v. The New York Central Railroad Co., 232 F.Supp. 28 (S.D.N.Y.1964), aff'd, 341 F.2d 233 (2nd Cir. 1965); Brennan v. Matson Navigation Co., 345 F.Supp. 1179 (N.D.Cal.1972).

quiescence and consent of Fox, however, were in derogation of his duty.

Accordingly, the petition for exoneration or limitation of liability is denied and judgment shall be entered in favor of claimants as above specified. The issue of damages has been bifurcated and will be set for trial upon application of counsel should they be unable to reach a settlement. Costs will be assessed at that time.

This opinion shall constitute the court's findings of fact and conclusions of law pursuant to F.R.C.P. 52(a).

## ON MOTION FOR RECONSIDERATION

Claimant Nichols moves the court to reconsider his opinion and to amend his findings of fact and conclusions of law contained therein by elimination of any reduction in damages by reason of negligence attributable to Nichols. Claimant asserts that such negligence should have been affirmatively pleaded and that as a result of petitioner's failure to so plead, the defense has been waived.

I disagree. From its inception, this case has revolved around the activities of Nichols, thus negating any element of surprise. The motion is, therefore denied and, to the extent necessary, the pleadings are deemed amended to conform to the proof.

As indicated by the court, the evidence established Nichols to be negligent in venturing into the teeth of a well known and treacherous hazard with an inadequate and incompetent crew. He consented to the absence of a mate and proposed the employment of McKee. As such, he contributed to his own demise as well as that of the others aboard DEEP SEA.

I had misgivings about allowing Nichols any recovery. While I believe the dissenting opinion of Judge Hamley in *Admiral Towing Company v. Woolen,*[1] states the better rule, I am compelled to follow the majority opinion in that case which allowed recovery in circumstances similar to those herein.

It would be a serious miscarriage of justice, however, to grant a full recovery to Nichols and I cannot in good conscience so do.

---

1.  290 F.2d 641 (9th Cir. 1961).