Marion O'CONNOR, Plaintiff,

v.

CHANDRIS LINES, INC., Defendant.

Civ. A. No. 79–955–J.

United States District Court,
D. Massachusetts.

June 30, 1983.

Joseph G. Abromovitz, Boston, Mass., for plaintiff.

Frank H. Handy, Jr., Kneeland, Kydd & Handy, Boston, Mass., for defendant.

## OPINION

JULIAN, Senior District Judge.

The plaintiff, Marion H. O'Connor, of Medford, Massachusetts, brought this action in 1979 against the defendant Chandris Lines, Inc., to recover damages for personal injuries she claims she sustained at sea as a passenger on defendant's ship, the S.S. Victoria, on or about May 29, 1978. Jurisdiction is founded on the diversity of citizenship of the parties under 28 U.S.C. § 1332 and the admiralty jurisdiction of this Court pursuant to 28 U.S.C. § 1333.

Plaintiff is a resident of Massachusetts. Defendant is a foreign corporation having a usual place of business in the State of New York.

After a trial on the merits, the Court, sitting without a jury, makes the following findings of fact and rulings of law:

In April 1978, the plaintiff and her husband, Kevin J. O'Connor, purchased from the defendant, through its agent, Olde Harbour Travel of Boston, Massachusetts, passage for an air-sea vacation which in-

cluded travel by air to Venice, Italy, where they were to join the S.S. Victoria, a sea-going cruise ship, which at all times material to this action was owned and controlled by the defendant. The ship was scheduled to sail from Venice on a fifteen-day Adriatic and Mediterranean cruise including stops and sight-seeing tours at seven cities, countries and islands, including the Holy Land. The cruise was of special significance to Mr. and Mrs. O'Connor because it included visits to holy places in the Holy Land. The total price paid by the O'Connors for the air-sea vacation to Olde Harbour Travel, as agent for the defendant, was $3,110.15. As provided in the tour, the plaintiff and her husband travelled by air from New York to Amsterdam to Milan and by bus from Milan to Venice where they joined the S.S. Victoria on May 27, 1978.

They were assigned to Cabin E–57. The cabin was equipped with two bunk beds, one situated on top of the other. From the time the bunks were first used on the night of May 27, until the time of the accident, shortly after midnight on May 30, Mr. O'Connor slept in the upper bunk and the plaintiff slept in the lower. Mr. O'Connor weighed approximately 210 to 215 pounds. They were the only occupants of cabin E–57. Access to the upper bunk was provided by a ladder situated on the side of the bunk opposite the bulkhead to which the bunks were affixed and was so designed that the occupant would simply roll onto the bunk from the ladder. The frames of the bunks were made of wood.

The ship sailed from Venice on May 27, 1978. On May 29, the plaintiff and her husband returned to their cabin at about 11:00 p.m. and retired. Shortly after midnight, May 30, while they were both asleep in their respective bunks, the upper bunk with the husband lying in it suddenly, without warning, broke from the mounting and fell directly on top of the plaintiff as she lay sleeping in her bunk below. The falling bunk struck the plaintiff on the head, chest, arm and leg. The plaintiff was violently awakened by the impact. The husband was trapped in a corner of the cabin by the collapsed bunk and could not free himself to help his wife or reach the telephone to summon help. The plaintiff was able to reach for the phone by her bunk and called for help. The cabin boy arrived, assisted the plaintiff, called the nurse, and extricated the husband from the fallen bunk. The nurse and the cabin boy then administered first aid to the plaintiff and the ship's doctor was summoned.

The doctor came and made a bedside examination of the plaintiff. His findings are recorded in his medical report (Ex. 1) dated May 30, 1978. He found her forehead and left shoulder muscles bruised; shortness of breath and "wheezing"; he heard mixed rales bilaterally along the whole chest; dullness and wet rales on both bases of the chest; her heart rate was 110 per minute; her heart was under strain with many extra beats; and a systolic murmur extending to the left axilla; her blood pressure was 125/85. I accept the doctor's report as factually true.

At 1:20 a.m., May 30, she was given an intramuscular injection of Lasix, two tablets of Aerolyn of 2 m.g. each (a bronchospasmolytic agent) and placed in a comfortable position. Lasix is a diuretic to get rid of fluid in the lungs. He examined plaintiff again at 3:30 a.m., May 30. The wheezing and strain of heart had decreased and reaction to Lasix was satisfactory. The doctor examined her again at 8:00 a.m.; no wheezing was found; the chest was almost clear; there was no dullness and the strain on the heart was improving. The patient was put on a quick digitalization regimen, viz., Digoxin with occasional use of Aerolyn. On the doctor's orders she was transferred to another cabin and propped up in an upright position. The doctor told her that her lungs had filled up with fluid and that she had had a slight heart attack. She was greatly frightened and upset by this. She thought she was going to die. She did not sleep at all the rest of the night. She was coughing and wheezing. She felt all "filled up."

At the time of the accident plaintiff was 63 years of age.

Shortly after the accident the broken bunk was examined by the ship's captain, the chief purser, and the joiner and it was found that the accident happened due to the splitting of the wood at the second support point of the bunk (Ex. 6, Log-book Abstract).

All these events took place in the early morning hours of May 30. Later that same day the ship pulled into Piraeus, the port for Athens, for a tour of the Acropolis. Everyone on the ship was going. The plaintiff asked the ship's physician if she could go. He gave her permission to go ashore but ordered her to remain on the bus. She and her husband did go ashore but she followed the doctor's orders and remained behind on the bus. She did not join the others on the tour of the Acropolis. When they returned to the ship she was having difficulty breathing. She called the doctor and he gave her more Aerolyn pills to relieve her.

As a direct result of the accident the plaintiff developed pulmonary edema, a condition in which the lungs fill up with fluid from within the body, and also developed atrial fibrillation, a condition whereby the heart pumps out blood irregularly. The sensation experienced by the victim of pulmonary edema is one of drowning. Both conditions were life-threatening and could have caused plaintiff's death. She should have been hospitalized. There is no evidence, however, that the ship was equipped with a hospital or infirmary.

The plaintiff had suffered rheumatic fever when she was about seven years old. She recovered but it left her with a condition called mitral stenosis which is the narrowing of the mitral valve within the heart caused by the formation of scar tissue about the valve and restricts the free flow of blood from the heart. Generally, but not always, individuals who have mitral stenosis eventually develop atrial fibrillation. They may live to old age without further trouble from this source.

Prior to the accident in question plaintiff had never been in a condition of atrial fibrillation. She had never been incapacitated by her heart condition and she had never been prescribed any medication for a heart condition. Before the cruise she had been gainfully employed full-time and had regularly performed her household work, and she had engaged in social recreational activities without encountering health problems. She and her husband particularly enjoyed dancing. She frequently participated in social dances without experiencing physical difficulties. They have no children. Dr. Rifkin, a cardiologist called as an expert witness by the plaintiff testified, and I find, that the onset of atrial fibrillation in the plaintiff was precipitated by the accident on the ship.

After the accident the ship's physician administered Digoxin and Coumadin to the plaintiff. Both medications are used to treat and control atrial fibrillation. She was also given Lasix, a diuretic to get rid of fluid in the lungs. The purpose of Digoxin is to slow down the heart rate. When the heart is beating rapidly there is less time for the chambers to fill and therefore they are less able to pump the blood forward. The problem is greatly accentuated in people who have mitral stenosis because they have a narrow valve and need a longer period of time for the blood to go through. If the blood is pushed across the valve too fast which happens when the heart is beating rapidly, the blood cannot get across fast enough and backs up and causes congestion or pulmonary edema. Digoxin slows down the heart rate and gives the blood in the main chamber of the heart adequate time to flow through this narrow valve. Coumadin is an anti-coagulant that prevents blood clotting. When the atrium is fibrillating the walls of the atrium tend to foster the development of clots on the walls. These clots break off and go into the blood stream and cause strokes or other catastrophic consequences. The purpose of an anti-coagulant is to prevent the formation of blood clots on the walls of the atrium and thus prevent embolization. The administration of Digoxin and Coumadin to the plaintiff in her circumstances was necessary and proper. In atrial fibrillation with mitral steno-

sis, both these drugs are needed. The use of these drugs, however, involves substantial hazards. If the use of Digoxin reaches too high a level it can produce very serious rhythmic disturbances of its own. With Digoxin the toxic level is not much higher than the therapeutic level. Therefore, its use must be carefully regulated. The danger from the use of Coumadin is that it interferes with coagulation of the blood and exposes the patient to the risk of bleeding anywhere in the body, including the brain, the spinal cord, and the gastro-intestinal tract. To control these risks it is necessary for the plaintiff, whose therapy requires the use of these two drugs, to have a blood test on a monthly basis and periodic checks for the rest of her life. The incident on the ship precipitated the earlier administration of Digoxin and Coumadin than would have been the case if the accident had never occurred.

For more than forty years prior to this accident on the ship plaintiff had been well. She had been fully employed and had been tolerating significant degrees of physical exertion, including housework and recreational dancing without ever having suffered an episode of atrial fibrillation. The first indication that plaintiff suffered atrial fibrillation occurred soon after the accident on the ship when the ship's physician administered medical first-aid and prescribed Digoxin and Coumadin. Atrial fibrillation is a life-threatening condition. A diagnosis of mitral stenosis had been made in 1974 at the Leahey Clinic when she was examined for a complaint unrelated to this case. (Ex. 2A).

After the accident plaintiff's participation in activities on the ship came to a halt, and her participation in the tours for the remainder of the cruise were severely curtailed, and impeded by her condition. She felt continually tired, worn, and nervous. She continued to be very upset and had difficulty breathing. She continued to see the ship doctor who continued her on the medications. As a result of all these things plaintiff derived no benefit from the cruise.

Plaintiff and her husband returned to Massachusetts on June 11, 1978. She was still feeling very tired, weak, and nervous, and therefore she scheduled an appointment to be examined at the Leahey Clinic. The earliest appointment they could give her was on June 15, 1978. She went to the Clinic on that date and was placed in the care of Dr. Charles Z. Naggar, a cardiologist at the Clinic. She is still under his care. He examined her and a report of his findings and treatment was received in evidence as Exhibit 3. He found that the examination of the heart revealed evidence of mitral stenosis; that the chest x-ray, electrogram, and echocardiogram all documented the fact that she had a rheumatic heart and mitral stenosis. I accept these findings as true. He prescribed Digoxin daily and Coumadin with proper blood levels to insure adequate anti-coagulation followed up periodically at the Clinic with a prothombin time taken once a month.

Dr. Sagall, a cardiologist called as an expert witness by the defendant testified on cross-examination that in his opinion the incident on the ship would have been competent to produce an episode of atrial fibrillation in a patient such as the plaintiff with her pre-existing disease of atrial stenosis. I accept this opinion as valid. He also testified and I find that there was no evidence on the record that prior to the accident plaintiff had ever been observed to be in a condition of atrial fibrillation, or had ever been put on Digoxin or Coumadin. The permanent condition of atrial fibrillation in the plaintiff was first documented at the Leahey Clinic in September 1978. This condition was hastened by the injuries she received in the accident on the ship and will continue for the rest of her life.

Plaintiff was totally incapacitated for work by the injuries she received in the accident on the ship so that when she returned to Boston from her cruise on June 12, 1978, she was unable to resume work until July 24, 1978. When she left for the cruise plaintiff was employed full-time by Harbridge House, Inc., of Boston, as a switch-board operator-receptionist. Her average weekly earnings were $234.48. She

thus lost six weeks' earnings for a total of $1,406.88. I find that she was partially incapacitated from July 24, 1978 until she terminated her employment on June 11, 1979. She went back to work on a part-time basis on July 24, working four hours a day, 20-hour week, for an average weekly pay of $134.00 until January 1, 1979. Her total earnings for that period of partial disability were $2,948.00. On January 1, still partially disabled, she began working a 4½ hour day and her average weekly earnings rose to $150.75. She continued working at that rate until June 11, 1979, when she terminated her employment. The reason she gave her employer for terminating was that she had decided to retire. Her total earnings for this last period were $3,467.25. I find that plaintiff sustained a total loss of earnings of $5,777.71 as a result of the injuries she received in the accident which is the difference between what she would have earned had she not been disabled and what she actually earned working part-time. As a result of such accident she also incurred to the time of the trial medical expenses amounting to $1,419.00. It was stipulated that the continuing monthly laboratory test required for her treatment would cost $8 per month for the rest of her life. She was 67 years old at the time of the trial. No evidence whatever was introduced of her life expectancy. She claims that she had intended to retire at age 65 but retired a year earlier because of excessive fatigue. I find that excessive fatigue is one of the symptoms of atrial fibrillation. But that was not the reason she gave her employer. No medical evidence was introduced at the trial tending to show that she was incapable of continuing to work part-time for another year.

■ The rule of res ipsa loquitur is applicable to this case. The rule is stated in *Jesionowski v. Boston & Maine Railroad Co.,* 329 U.S. 452, 67 S.Ct. 401, 91 L.Ed. 416 (1947) at page 456, 67 S.Ct. at page 403, as follows:

"When a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the defendant, and the injury is such, as in the ordinary course of things, does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care. [cases cited]"

In *Johnson v. United States,* 333 U.S. 46, 48, 68 S.Ct. 391, 392, 92 L.Ed. 468 (1948) the Court further clarified the rule:

"The rule res ipsa loquitur applied in *Jesionowski v. Boston & Maine Railroad Co.* means that the facts of the occurrence warrant the inference of negligence not that they compel such an inference. *Sweeney v. Erving,* 228 U.S. 233, 240 [33 S.Ct. 416, 418, 57 L.Ed. 815]."

See also Restatement of the Law, Torts, (Second), § 328D.

At the time of the accident the defendant owned, operated, and was in exclusive control of the sea-going S.S. Victoria. As a carrier of passengers for hire, defendant was under a continuing legal duty to exercise reasonable care for the safety of its passengers. The reasonable care that the defendant was legally required to exercise was the highest degree of care consistent with the safe transportation of its passengers and the practical operation of the undertaking in which it was engaged, in this case a sea-going cruise. The defendant was under a continuing legal duty to provide the cabin passengers, such as the plaintiff and her husband, with sleeping accommodations that were reasonably safe. With specific reference to the bunks in the cabin the defendant was under a continuing legal duty to provide bunks that were soundly constructed and securely held in place, and strong enough with a reasonable margin of safety, to sustain a passenger of the weight of plaintiff's husband. The frames of the bunks were made of wood. There is no evidence of the age of the S.S. Victoria or of the length of time the bunks in Cabin E–57 had been in service, or of the last time prior to the accident they had been surveyed, or inspected or by whom, or of the nature and extent of any such survey or inspection. The only persons in the cabin

when the bunk collapsed and fell on the plaintiff were the plaintiff herself and her husband. Both were lying asleep in their respective bunks at the time of the collapse. The sea was calm. No member of the defendant's crew testified at the trial either in person or by deposition concerning the condition of the cabin or of the bunks prior to the accident. I find that no negligent conduct of the plaintiff or her husband was a responsible or contributing cause of the collapse of the bunk. There is no evidence that any conduct on the part of any third person was a cause of the collapse. The collapse of the bunk in the circumstances disclosed by the evidence is something which ordinarily does not occur in the absence of negligence on the part of someone. The evidence does not disclose any other probable explanation for the collapse of the bunk except the negligence of the defendant in permitting the bunk to be or remain in a defective condition. I draw the inference authorized by the rule of res ipsa loquitur that the collapse of the upper bunk on the plaintiff and her resulting injuries and consequential damages were in fact caused by the negligence of the defendant.

I find for the plaintiff and assess damages in the amount of $47,197.00 with interest from the date when this action was commenced.