**Carmen FEBLES RIOS, Plaintiff,**

v.

**PHAIDON NAVEGACION, S.A., Defendant.**

**Civil No. 85–0298 (JP).**

United States District Court, D. Puerto Rico.

Sept. 16, 1985.

Pedro J. Varela, Hato Rey, P.R., for plaintiff.

Jimenez & Fuste Law Offices, San Juan, P.R., for defendant.

## OPINION AND ORDER

PIERAS, District Judge.

The plaintiff, Carmen Febles Ríos, brought this action against the defendant, Phaidon Navegación, S.A., to recover for damages for personal injuries she claims she sustained at sea as a passenger on defendant's ship, the "M/V VICTORIA". The action was submitted to the Court under its admiralty jurisdiction, 28 U.S.C. § 1333, and a non-jury Trial was held on April 12, 1985. An on-site inspection of the vessel and specific place of injury was held on April 15, 1985. Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following findings of fact and conclusions of law.

### I. FINDINGS OF FACT:

1. On June 5, 1984, plaintiff, a 56 year old single woman, came aboard the M/V VICTORIA as a passenger. The vessel, a passenger cruise ship, was to undertake a Caribbean cruise that would start and end in San Juan, Puerto Rico, and include stops at Venezuela, Costa Rica, Panama, St. Andrew and the Dominican Republic. During the cruise, she was accompanied by a group of friends. This cruise was the second time plaintiff had been a passenger aboard this ship.

2. On the evening of June 11, 1984, plaintiff was participating in some of the usual activities that take place aboard cruise ships. During that evening, she attended a costume contest that was held in what she described as the discotheque of the vessel. She participated in this affair as a juror of the contest until sometime around 11:30 p.m.

3. At some time shortly before midnight, plaintiff and a group of friends left above mentioned area to attend a different activity which was on the opposite end of the same deck of the ship (the "Rendezvous Deck").

4. To get from one ballroom to the other, there is a long carpeted corridor. Along the corridor, there is one section which contains a casino area and another section which contains some small shops. At that end of the corridor there is a small lobby area. This lobby area separates the corridor from the "Riviera Ballroom". There are doors at the end of the corridor, and just before entering the "Riviera Ballroom". The doors at the end of the corridor include a set of glass doors which separate the corridor from the lobby, and a heavy one-piece fire door which sits inside the wall and which comes across the opening of the door on a small railing system which runs across the floor. This fire door is necessary for the safe operation of the vessel.

5. While plaintiff walked with a group of friends from one area to the other, she fell when she "bumped" into the metal railing system.

6. There is a lot of traffic in the area of the railing, but nobody else had fallen or bumped against the railing before this time. Neither had there been any report of a defect or evidence of defective railing before the accident.

7. After the accident, the railing was found to be (somewhat) bent.

8. Plaintiff had traveled before on this vessel and was familiar with the situs, entrances, obstacles, etc. of the vessel.

9. As soon as the fall occurred, plaintiff was attended to by her friends, by the Staff Captain of the ship, who was stationed at the lobby area at the time of the accident, and later by the ship's physician who was summoned by ship's personnel. She was eventually taken to her cabin in a wheelchair and given medication.

10. On June 13, the vessel arrived at the Dominican Republic. There, plaintiff was taken by ambulance to a hospital where she underwent X-rays. The X-rays revealed that plaintiff had suffered an intracapsular fracture of the left femur. Plaintiff was offered the option of remaining in the Dominican Republic for treatment, but she elected instead to return to the ship and continue the voyage to receive further medical treatment in Puerto Rico. The vessel arrived in San Juan on June 14 and plaintiff was transferred to Auxilio Mutuo Hospital. She underwent surgery there on June 18, 1984, and a Bateman prosthesis was inserted into her left hip.

11. After the surgery, plaintiff remained at the hospital for fifteen days. She underwent physiotherapy treatment for several months. On August 13, 1984, treating physician José Suárez Castro, M.D., found her to have complete range of motion in the left hip. The plaintiff continues to use a walking cane. According to the American Medical Association guidelines for evaluation of permanent impairment, plaintiff suffers a 20% disability in the functions of her left lower extremity as a result of the fracture of her left hip.

## II.  CONCLUSIONS OF LAW:

As the operator of a cruise vessel, with respect to its passengers, the defendant was under a duty to exercise reasonable care under the circumstances. *Kermerac v. Compagnie Generale Transatlantique,* 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). Some courts have described this duty as the "highest degree" of care. *See, e.g., O'Connor v. Chandris Lines, Inc.,* 566 F.Supp. 1275, 1279 (D.Mass.1983); *Complaint of Compagnie Generale Transatlantique,* 392 F.Supp. 973, 976 (D.P.R. 1975). Others have discussed whether there is a difference between a "very high degree of care" and "reasonable care under the circumstances". *See Rainey v. Paquet Cruises, Inc.,* 709 F.2d 169, 171–72 (2d Cir.1983). Irrespective of how the degree of care is phrased, under the factual circumstances of this case, the central issue is what the cause of the fall was, and, consequently, whether any fault or negligence

can be attributed to the vessel in light of this cause.

After careful review of the content of the testimony of the witnesses at trial, the exhibits submitted by the parties, and from the observations made by the Court during its on-site inspection of the scene of the accident, the Court concludes that the plaintiff has not shown by a preponderance of the evidence that the defendant failed to provide the required high degree of care and that this failure caused the accident.

First, on the night of the accident, there was much activity taking place on the ship, and there was heavy traffic along the corridor and doorway in question. As plaintiff passed through this area, she was part of a large group which conversed as they walked, thus diminishing the attention she gave to where she was going.

Second, the fire door railing system which plaintiff "bumped" into is highly visible. It is made of shiny stainless steel. Moreover, as the Court observed, there are several of these throughout the ship. In addition, there are higher protuberances which serve as part of the water-tight door system, and many of these are found throughout the vessel. It is undisputed that plaintiff had passed through this and other similar areas of the vessel many times before. This was, in fact, her second time aboard as a passenger.

Third, the fire door apparatus, and consequently the railing system, is of vital importance and necessity to the overall safety of the ship. As revealed by the trial testimony, in the event of a fire on board the ship, the fire door would be closed so as to isolate and contain the fire to prevent it from spreading and make it easier to extinguish. Because the fire door apparatus is necessary for the safety of the ship, it is entirely reasonable that passenger ships such as the "M/V VICTORIA" be equipped with such apparatus.

Fourth, the Court finds that the design, construction and layout of the fire door railing system was not defective, dangerous or unreasonably obstructive for passenger traffic. The railing itself, which is in the center of a channel, appeared to be less than one inch in height. Further, there was nothing unusual as to the width of the same. No evidence was presented to show that the railing was slippery or tricky to step on or to cross over. In short, as a whole, this area is similar to the sill of many commonplace door frames.

We are conscious of the fact that plaintiff's trial testimony indicated that some part or portion of the lower frame area became loose and separated at the time of or immediately after the fall. Plaintiff testified that a metal part of the railing system fell on top of her at a distance of six to eight feet from the door. There was also, however, testimony from the Captain of the ship, who was only a few feet away from the scene, to the effect that he inspected the area immediately after the fall and found nothing loose or missing. From the Court's observation made during the examination of the railing area, coupled with our assessment of demeanor and overall analysis of what more likely than not occurred, we conclude that the accident occurred when plaintiff "bumped" into the lower railing, and not as a consequence of a defect in the railing system. In doing so, we necessarily conclude that the accident in question was due to causes attributed to the plaintiff and not the defendant.

We thus find that the defendant did not breach its duty of care owed its passengers. In this sense, our conclusion resembles that reached by Judge Thompson under somewhat analogous circumstances in *Essau v. United States*, 1979 A.M.C. 736 (S.D.Cal.1979). In that case, the plaintiff had fallen after slipping on the one-and-a-half inch drop of the "scupper system" on the main deck of the U.S. Navy ship "CHICAGO". The Court found that the drop in the "scupper system" was not an unreasonable or negligent condition, and that the plaintiff knew, or should have known, that an ocean-going vessel had many necessary "[a]ppurtenances, protuberances and structural conditions" which required a certain level of caution by visitors. 1979 A.M.C. at 738.

For the reasons stated herein, judgment shall be entered in favor of the defendant DISMISSING the complaint.

The Clerk shall enter Judgment accordingly.

IT IS SO ORDERED.